J. E03004-14

2015 PA Super 267

| | |
|---|---|
| ROY H. LOMAS, SR., D/B/A/ ROY LOMAS CARPET CONTRACTOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JAMES B. KRAVITZ, ANDORRA SPRINGS DEVELOPMENT, INC., CHERRYDALE CONSTRUCTION CO., EASTERN DEVELOPMENT ENTERPRISES INC., AND KRAVMAR, INC. | |
| Appellants | No. 2391 EDA 2011 |

Appeal from the Judgment Entered August 16, 2011
In the Court of Common Pleas of Montgomery County
Civil Division at No. 00-5929

BEFORE:   BENDER, P.J.E., BOWES, J., PANELLA, J., DONOHUE, J., SHOGAN, J., ALLEN, J., LAZARUS, J., WECHT, J., and STABILE, J.

OPINION BY PANELLA, J.                    **Filed:  December 21, 2015**

This appeal concerns two phases of the underlying trial: the liability verdict and the damages assessment. As detailed below, the entire Court affirms the liability verdict entered by the Honorable Thomas P. Rogers of the Court of Common Pleas of Montgomery County. Accordingly, our holding and reasoning in that regard is binding and precedential. **See Commonwealth v. Brown**, 23 A.3d 544, 556 (Pa. Super. 2011) (*en banc*).

The reasoning for our affirmance of the liability verdict follows these introductory words.

The damages verdict is affirmed by an equally divided Court. Our holding and reasoning with respect to damages is, therefore, non-precedential and binding only on the parties. **See *id***.

In relation to the damages verdict, the issue on appeal was whether Judge Rogers, as well as the entire Montgomery County bench, should have recused. The Majority holds that Appellants' recusal motion was patently untimely and, therefore, waived. We further conclude that the recusal motion was a baseless attack on the trial court following an unfavorable verdict on liability, made at the expense of the integrity of the Montgomery County trial bench. This is a waiver case, not an "appearance" case. Judge Rogers, as the trial judge, made every disclosure that was required of him. Appellants concede that there is no evidence that Judge Rogers showed bias, unfairness, or prejudice.

Additionally, under the facts of this case, we cannot agree with the Dissent that a conflict, which affects but a single judge, leads to the recusal of the entire trial bench of over twenty trial judges.[1]

---

[1] The Dissent fails to provide any principled rule or guidance for the trial bench to assess these challenges in the future. For example, the Philadelphia trial bench has over 100 judges and the Allegheny Court of Common Pleas has over 40 judges; it cannot seriously be argued that a conflict of a *single* judge carries over to taint the *entire* trial bench in these counties, as well as other counties.

Finally, any result other than an affirmance would absolve Kravitz for his campaign of incessant use and abuse of our civil litigation processes.

**The Parties on Appeal**

Appellants, James B. Kravitz, Andorra Springs Development, Inc. ("Andorra Springs"), Cherrydale Construction Company ("Cherrydale"), and Kravmar, Inc., formerly known as Eastern Development Enterprises, Inc. ("Eastern"), collectively known as the "Kravitz Entities," appeal from the judgment entered on August 16, 2011, in favor of Appellee Roy H. Lomas, Sr., d/b/a/ Roy Lomas Carpet contractor ("Lomas"), in the amount of $1,688,379.10.

**Summary**

In 1994, Appellant Cherrydale and Appellee Lomas entered into a contract in which Appellee agreed to supply and install floor coverings in new construction homes being built by Cherrydale. Appellee began work immediately, but shortly thereafter Cherrydale breached the contract and Appellee stopped work. At that point, Cherrydale owed Appellee $30,913.00. The matter went to arbitration and a panel of arbitrators unanimously concluded that Cherrydale had breached the contract. After the entry of an interim award of $30,913.00 in Appellee's favor, Cherrydale petitioned to vacate the interim award.

In September 1998, the arbitration panel entered a final award totaling $200,601.61, in accordance with the Contractor and Subcontractor

3

Payment Act ("CASPA"), 73 P.S. §§ 501-516, which included the $30,913 balance due for work performed plus compensatory damages, attorney's fees, costs, and interest calculated in accordance with CASPA. Cherrydale filed a petition to strike the final award which was ultimately denied on October 31, 2001. While the petition was pending, Appellant Kravitz transferred all assets out of Cherrydale, Andorra Springs, and Eastern to himself and other entities under his control.

In March 2000, Appellee initiated the instant action seeking to pierce the corporate veil of the Kravitz Entities and alleging fraud and fraudulent transfers. Several years of legal proceedings and discovery ensued before a bench trial commenced in January 2007. The parties agreed to bifurcate the trial, and after the court entered a liability verdict and order in favor of Appellee and against Appellants in July 2007, the damages phase commenced in September 2007.

After the close of the record following the second phase of the trial, but before the trial court rendered its final verdict, Appellants sought recusal of the entire Montgomery County Court of Common Pleas. More delays ensued before the trial court denied the motion. On April 29, 2011, the trial court issued extensive findings of fact and conclusions of law determining that Appellant Kravitz had intentionally deprived Cherrydale of assets with which to pay Appellee, and had intentionally and fraudulently disregarded the corporate form, intermingling his and his company's affairs to perpetrate

4

a fraud and injustice. The trial court confirmed the initial arbitration award of $200,601.61 and awarded compensatory and punitive damages, attorney's fees, interest, and penalties for a total award of $1,688,379.10. After the entry of judgment on August 16, 2011, Appellants timely appealed to this Court. A three-judge panel of this Court affirmed after adopting the trial court's Pa.R.A.P. 1925(a) opinion as its own. This Court then granted reargument, *en banc*.

## Background

### The Kravitz Entities

From 1994 to 1998, Appellant James B. Kravitz was the sole officer, director, and 100% shareholder of a group of companies known collectively as the Andorra Group.[2] The Andorra Group was comprised of many subchapter S corporations involved in the home building business including, but not limited to, Appellants Andorra Springs, Cherrydale, and Eastern. Kravitz did not hold corporate meetings or otherwise conform to standard practices required of such entities. Appellant Kravitz personally owned The Reserve at Lafayette Hill in Whitemarsh Township (the "Reserve"), a large parcel of land which he divided into six sections for residential development. He contributed Sections I, II, and III, valued at $3.2 million, to Andorra Springs, which had been formed for the sole purpose of owning Sections I,

---

[2] The Andorra Group was a fictitious name representing all of Kravitz's companies, most of which were in the home building business during the years 1994-1998. The name was used by Kravitz so that he could have one name for his developments that would be recognizable by the public.

II, and III and developing single-family housing there. Kravitz kept Sections IV, V, and VI for himself. Sometime in 1996, Kravitz entered into an option agreement with Pulte Home Corporation of Delaware Valley ("Pulte") whereby Pulte purchased Sections IV, V, and VI from Kravitz.

Appellant Cherrydale was formed in 1989 but was inactive until 1993 when it contracted with Andorra Springs to build single-family homes. Andorra Springs was Cherrydale's only customer. Cherrydale had no capital, and the contract between Cherrydale and Andorra Springs had no inherent value to Cherrydale such that it could obtain a loan from a bank. Cherrydale was to receive payments directly from Andorra Springs for costs incurred in connection with building the homes.

Appellant Eastern served as the management and payroll company for the Andorra Group. Steven A. Braun was the Chief Financial Officer of Eastern from 1992 to 1996. After leaving his employment with Eastern, Braun was retained by Kravitz to offer accounting advice and prepare the tax returns for the companies within the Andorra Group.

**Appellee's Involvement and Subsequent Kravitz Actions**

On November 10, 1994, Cherrydale, as the contractor for Andorra Springs, contracted with Appellee to supply and install floor coverings in its new homes. Appellee began work immediately but stopped in December 1994 because Cherrydale had not paid him. At that point, Cherrydale owed Appellee $30,913.00. In January 1995, Appellee demanded that Appellant

Cherrydale submit to arbitration in accordance with their contract. Thomas C. Branca, Esq., represented Appellee at the arbitration. On May 24, 1996, the arbitration panel issued an interim partial award, finding that Cherrydale had breached its contract with Appellee and had violated CASPA, 73 P.S. §§ 501–516. Immediately thereafter, Kravitz filed a petition seeking to have the interim award vacated.

During the pendency of that petition, Appellant Kravitz and his accountant decided that due to allegedly declining financial conditions Cherrydale, Andorra Springs, and Eastern were each insolvent. Accordingly, on December 20, 1996, Kravitz, as sole shareholder, director and secretary of each company, executed a "Combined Unanimous Consent of Shareholders and Directors" for each of the three companies terminating their business activities. He also directed each company to take the necessary steps to wind-up and terminate all residential construction and related business activity and sell any remaining assets associated therewith, and "to pay, to the extent possible, the substantial amounts of inter-company accounts payable or to otherwise cancel those accounts payable." On December 31, 1996, Cherrydale wrote off debts of $2,159,575 owed to it by Andorra Springs. On January 4, 1997, Kravitz authorized Cherrydale to cancel both its accounts payable and accounts receivable.[3]

---

[3] Cherrydale continued to build homes for Andorra Springs in 1997 and 1998 even though Cherrydale was allegedly winding down its business.

**Kravitz Entities' Inter-Company Transactions**

Funds that were supposed to flow from Andorra Springs, the owner, to Cherrydale, the contractor, were never paid. By the end of 1996, Andorra Springs owed Cherrydale $3.7 million for the homes Cherrydale had built.[4] In addition, Cherrydale had incurred $714,000 in costs relating to the site improvements to Sections I, II, and III of the Reserve that benefited Sections IV, V, and VI. However, at the same time that Andorra Springs was indebted to Cherrydale for the costs of constructing homes, Andorra Springs loaned Eastern approximately $5.8 million over and above what it owed Eastern for management services related to the Reserve. Eastern used the money from Andorra Springs to fund Kravitz's other interests, including, but not limited to, his horse farm, Burnt Chimney Farms,[5] his personal residence in Gladwyne and his other properties in Upper Dublin, Hunter's Pointe and Andorra Glen. By the end of 1996, Eastern had advanced over one million

---

[4] Braun authored memoranda in August 1994 and December 1995, which indicated that Cherrydale was profitable. It lacked cash only because Andorra Springs did not pay it.

[5] During 1995 and 1996, Andorra Springs made cash transfers or loans to Burnt Chimney Farms, Kravitz's horse farm. On December 31, 1996, the balance of the transfers and loans made by Andorra Springs to the farm was approximately $577,552. At the time of those transfers or loans, Burnt Chimney Farms was insolvent. Andorra Springs received no security for the transfers or loans, even though Burnt Chimney Farms had unencumbered assets valued at over $1,000,000 such as land, horses, and buildings. Burnt Chimney Farms never paid Andorra Springs back and Andorra Springs never took steps to collect the debt. Andorra Springs wrote off the $577,551.81 as bad debt.

dollars to Kravitz's then-insolvent horse farm. Eastern made no efforts to collect that debt. Kravitz eventually determined that Burnt Chimney Farms could not repay Eastern, and Eastern wrote it off as bad debt.[6] Kravitz also determined that Eastern could not repay Andorra Springs and wrote off approximately $4,905,000 as bad debt. While Eastern was allegedly insolvent, Kravitz transferred approximately $654,108 of Eastern's money to himself in the form of a capital distribution for which Eastern received nothing of value in return.

On June 12, 1997, the Honorable William T. Nicholas of the Montgomery County Court of Common Pleas denied Appellant's petition to vacate and confirmed the interim arbitration award.

In September 1997, while awaiting the entry of the final arbitration award, Kravitz directed Braun to make a series of adjusting journal entries for the year ending December 31, 1996, for the Kravitz entities. As part of the adjusting journal entries, Cherrydale, which had incurred $714,000 in costs relating to the site improvements that benefited Sections IV, V, VI,[7] transferred that account receivable to Andorra Springs. Cherrydale received nothing from Andorra Springs for the transfer except a promise to pay. The promise to pay was worthless to Cherrydale because Andorra Springs was,

---

[6] Kravitz also personally loaned Burnt Chimney Farms approximately $1.8 million, but he did not view his own loan as uncollectible and did not write off his loan to Burnt Chimney Farms as bad debt.

[7] Site improvements include grading, underground sewer systems, roadway, wiring for electricity, basically preparing the site for development.

at that time, insolvent. Once the account receivable for the site improvements had been transferred by journal entry adjustment to Andorra Springs, Andorra Springs transferred the site improvements, also via journal entry adjustment, to Kravitz and wrote off the debt it owed to Cherrydale. As a result of the transfer of the accounts receivable for the site improvement from Cherrydale to Andorra Springs, and from Andorra Springs to Kravitz, Kravitz owed Andorra Springs $714,000. Andorra Springs received nothing for the distribution to Kravitz, other than the cancellation of a loan of $124,000 allegedly made by Kravitz to Andorra Springs. Kravitz then received a capital distribution from Andorra Springs for the remaining $590,000. Andorra received nothing in exchange for the capital contribution. This series of transactions allowed Kravitz to avoid paying creditors of the Andorra Group companies, and to retain the value of the Andorra Group corporations through transfers of improvements, capital distributions, and write-offs of loans made to himself and his horse farm.

On September 4, 1998, the arbitrators issued a final award ("Final Award") pursuant to CASPA in the amount of $200,601.61, including compensatory damages, attorney's fees, costs and interest determined as follows.

Unpaid balance for work performed by Lomas: $ 30,913.00

Interest on Unpaid balance [at 1% per month]
up to and including August 7, 1998: $ 13,302.00

Lost profit for unperformed work due to

| | |
|---|---|
| improper termination of the contract: | $ 94,199.00 |
| Interest on the lost profit amount [at 6% per annum] up to August 7, 1998 less interest on the deposit credit from April 1, 1995 to August 7, 1998: | $ 14,872.00 |
| Attorney's fees and litigation costs: | $ 41,834.78 |
| Reimbursement of administrative fees and expenses: | $ 4,032.66 |
| Reimbursement of compensation and expenses of the arbitrators: | $ 1,448.17 |
| TOTAL | $200,601.61 |

Final Award of Arbitrators, 9/4/98, at R.R. 722a.

The Final Award confirmed that interest would accrue on the unpaid balance for work performed ($30,913) at 1% per month as provided by CASPA, 73 P.S. § 512, and interest on the portion of the award for lost profit ($94,199) would accrue at the legal rate of 6% per annum. On September 16, 1998, after the entry of the final award as a judgment against Cherrydale, Cherrydale filed a petition to strike the judgment.

During the pendency of that proceeding, Appellee conducted discovery in anticipation of executing on the judgment and discovered that Appellant Kravitz had transferred all assets from Cherrydale, Andorra Springs, and Eastern to his other entities and himself.

**The Instant Litigation**

On March 31, 2000, while awaiting the trial court's decision on Cherrydale's petition to vacate the judgment, then-Attorney Thomas Branca

11

initiated the instant action by filing a complaint on Appellee's behalf seeking to collect the September 10, 1998 judgment based on: (1) piercing the corporate veil; (2) fraudulent transfer under the Uniform Fraudulent Transfer Act, 12 Pa.C.S.A. §§ 5101-5110; and (3) fraud. Discovery and motions ensued.

In November 2001, Attorney Branca was elected to the Montgomery County Court of Common Pleas; he referred his case load to other attorneys, and filed a withdrawal of appearance in the instant matter on January 4, 2002. On March 1, 2002, attorneys from Spector, Gadon & Rosen P.C. ("SGR") entered their appearances on behalf of Appellee, and filed motions to compel the production of documents that had previously been requested. Soon thereafter, Appellant Kravitz filed a petition to have SGR disqualified. After a hearing, Judge Nichols concluded Appellants' concerns were without merit and denied the motion in June 2002.

When discovery was nearly complete, Appellants' attorney sought to withdraw as counsel over a payment dispute with Kravitz. A hearing ensued, during which Appellants' counsel assured Appellee and the court that the case would not be delayed by the substitution of counsel. Attorneys for both sides stated that they were preparing motions for summary judgment.

Notwithstanding their promise of no further delays, in July 2004, after Appellee filed a motion for summary judgment, Appellants sought and received sixty additional days to conduct discovery. On the sixtieth day,

Appellants made additional requests seeking information and documents that had already been produced. Because of Appellants' redundant actions, the resolution of Appellee's summary judgment motion was delayed until June 2005 when the trial court denied it. Despite arguing in opposition to Appellee's summary judgment motion that there were material issues of fact, Appellants then filed their own motion for summary judgment thus causing further delay. Judge Nicholas ultimately denied their motion and the case was scheduled for trial. Between 2005 and 2007, trial was continued numerous times due to the alleged unavailability of Appellants' witnesses and experts.

At a pre-trial conference on January 12, 2007, the Honorable Thomas P. Rogers discussed with counsel, and specifically with Appellants' counsel, Steve Kapustin, Esq., the issue of now-Judge Branca having previously represented Appellee. Judge Rogers gave assurances to the parties that he had never discussed the case with Judge Branca. All counsel unequivocally agreed to proceed before Judge Rogers.

The liability phase of the bifurcated trial commenced on January 16, 2007. Accountants for both sides testified regarding the financial activities of Appellants, including the various transfers and loans amongst them, Kravitz's declaration of insolvency of each of Appellant Corporations after the entry of the May 1996 interim arbitration award, and the resulting tax implications and benefits flowing to Kravitz. On July 30, 2007, Judge Rogers

entered a liability verdict and order in favor of Appellee and against Appellants, concluding that Kravitz had misused his corporations and fraudulently transferred assets out of Cherrydale in wanton disregard for the rights of Appellee as a creditor. The court also concluded that the testimony provided by Kravitz and Braun was not credible. The court scheduled the second phase of the trial on damages and attorney's fees to begin in September 2007.

In preparation for the damages phase of the trial, Appellee served requests for production of documents on Appellants seeking to identify the net worth of Kravitz and his entities. Appellee received only a small number of the documents requested. On the eve of trial in September 2007, Kravitz produced tax returns and joints statements of financial condition between himself and his wife, but refused to produce many other court-ordered documents.[8]

At trial, Judge Branca testified regarding his involvement in this case prior to his ascension to the bench, his earned counsel fees, his referral of the case to SGR, and the referral fee Appellee had directed SGR to pay him at the end of the case. *See* Notes of Testimony ("N.T."), 9/6/07, R.R. at

---

[8] Kravitz refused to produce, among other things, 14 appraisals on non-residential real estate he owned, brokerage or bank statements for 2006 or 2007, documentation regarding certificates of deposit and money market funds held or cashed out in January 2007, and documents relating to two partnerships in Carlisle, Pennsylvania.

2504.[9] Judge Branca also testified that he had spoken with SGR and Appellee periodically about the case and indicated that his discussions "[were] nothing of substance." *Id*., at 2502. He also noted that he recalled a discussion with an SGR attorney regarding Appellee's expert's discussion of tax issues in his report, but observed that those issues that "were far from significant." *Id*., at 2503.

Judge Branca also clearly testified that he had never spoken with any judge about this case.

Three other witnesses, including Appellant Kravitz, then testified. Kravitz refused to answer many questions regarding his assets and the transfer of his assets. Kravitz did testify, however, that in 2001, he had $5.5 million in equity in the land owned by one of the Andorra entities, which was subsequently sold for $32 million. Kravitz and his wife split the net proceeds 80-20, and each opened certificates of deposit in the amount of $2 million. He would not or could not identify what was done with the remaining proceeds from the sale. He testified that the certificates of deposit had been liquidated in January 2007, but refused to state what he had done with the proceeds.

---

[9] Judge Branca testified that Appellee and SGR had decided that he would receive "a third referral of the net proceeds as a fee." *Id*., at 21-22. There is no indication in the record as to what "a third referral of the net proceeds" means or what it would include under the agreement forged between Appellee and SGR.

Kravitz also testified regarding numerous other assets, including commercial and residential parcels of land located in Plymouth Township, Upper Dublin, Hunter's Pointe, and Philadelphia, which were owned by various S Corporations in which he had an 80%-100% interest. He also testified that he owned 100% of the S Corporation that owned Burnt Chimney Farms, the 160 acre farm with polo fields, which he stated was valued at $3.5 million.[10] He also stated that in December 2006 he had $3 million in certificates of deposit and an additional $5 million in a money market account, but Kravitz could not identify where those funds had gone. He also stated that he had a home valued at $1.9 million in Gladwyne; a condominium in Florida, which he had transferred to a joint ownership with his wife during the pendency of the litigation; and a 2007 BMW for which he had paid $140,000 in cash. Kravitz testified that at the close of 2006, he had a net worth of over $27 million. **See** Findings of Fact – Damages, at 12-15.

At the close of the damages trial, over Appellee's objection, Appellants were granted 30 days to determine whether they needed to retain a forensic accountant to review the redacted invoices submitted by Appellee's attorneys. Although they stated that they would tell the court of their decision, the thirty days passed with no word from Appellants.

---

[10] Kravitz also testified that he "may have" paid the expenses for polo players from Argentina to play polo at the Farms, although he could not or would not testify as to which years and how many years he may have done so. Findings of Fact – Damages at 15, ¶ 71.

On October 15, 2007, after the record had been closed, Appellants appeared with newly retained counsel and submitted a motion for recusal of the entire Montgomery County Court of Common Pleas, transfer of venue, or assignment to an out-of-county judge based on Judge Branca's involvement with the case. On December 31, 2008, Judge Rogers denied the motion, stating:

> The imputed "appearance of impropriety" which Defendants claim exists by virtue of Judge Branca's interest in the underlying case provides the court with no legal basis upon which to conclude that Defendants cannot receive, have not received or will not continue to receive a fair and impartial trial in Montgomery County.
>
> * * *
>
> No appearance of impropriety exists or is presumed to exist simply because a Judge of the Court of Common Pleas of Montgomery County has an interest in the underlying case.
>
> * * *
>
> The undersigned will not permit a party who is dissatisfied with the progress of the trial mid-stream to arbitrarily attempt to cause the disqualification of the Presiding Judge. Judge shopping has been universally condemned and will not be tolerated at any stage of the proceedings. *See*, *e.g., Commonwealth v. Ryan*, 400 A.2d 1264 (Pa. 1979). The record here does not show prejudice or bias, hence, without substantiation in the record that they did not receive a full, fair and impartial trial, Defendants shall not be permitted to question the court's verdict.

Trial Court Opinion, dated 12/31/08, at 8, 12-13.

The court entered partial judgment pursuant to its July 30, 2007 order in favor of Appellee and against Appellants for $200,601.61. Appellants filed

an interlocutory appeal, which this Court quashed on March 5, 2009. Appellants then filed an application for extraordinary relief with our Supreme Court requesting that it exercise its King's Bench authority to assume plenary jurisdiction. Appellants simultaneously filed a motion for a stay of trial court proceedings with both this Court and our Supreme Court pending the outcome of the King's Bench application. The Superior Court denied Appellants' motion for a stay, and on June 3, 2009, our Supreme Court denied by *per curiam* order both the motion for a stay and Appellants' application for extraordinary relief. Appellants then filed a petition for reconsideration with the trial court for reconsideration of its denial of the recusal motion. That petition was denied, and on July 19, 2010, the trial court heard closing arguments on Appellee's claims for interest, attorney fees, and punitive damages.

On April 29, 2011, the trial court issued two orders, one detailing findings of fact and conclusions of law with respect to Appellants' liability, and the other assessing compensatory and punitive damages, penalties, interest, and attorney's fees in the amount of $1,688,379.10 as of April 30, 2011. After the denial of Appellants' post-trial motion, the prothonotary entered final judgment on August 16, 2011.

Appellants timely appealed to this Court, and have briefed the following seven issues.

> Whether, as a matter of law, the entire bench of the Montgomery Court of Common Pleas should have been recused,

18

and/or full, complete, and required discovery permitted, because of the irreparable appearance of impropriety created by the ongoing participation and financial interest in the litigation by a sitting member of that Court?

Whether, as a matter of law, the testimony of Appellee's expert should have been discredited and/or stricken, because Appellee's attorneys and a sitting member of the Montgomery County bench improperly altered, edited, and influenced the content of the expert's report. [*sic*]

Whether, as a matter of law, the corporate veil can be pierced to find James B. Kravitz individually liable, and all Appellants liable for fraudulent transfers, based on non-cash accounting adjustments and bookkeeping entries made by licensed professional accountants in the ordinary course of business pursuant to generally accepted accounting practices for the lawful purpose of minimizing tax liabilities. [*sic*]

Whether, as a matter of law, punitive damages may be awarded where the underlying arbitration award was based on the Contractor and Subcontractor Payment Act, which includes a provision authorizing the award of a statutory punitive penalty. [*sic*]

Whether, as a matter of law, punitive damages may be awarded where Appellants' conduct was motivated by generally accepted accounting and tax planning principles and not outrageous, willful, wanton, or reckless, and where Appellants' conduct in defending the litigation was within its due process rights and was not dilatory, obdurate, and/or vexatious?

Whether, as a matter of law, a punitive damages award far exceeding a 1:1 ratio with the compensatory damages award violates Appellants' rights to due process under the United States Constitution?

Whether, as a matter of law, the trial court could award Lomas attorney's fees, interest, and penalties under the Contractor and Subcontractor Payment Act ("CASPA") when Lomas did not bring a claim under CASPA, the trial court was precluded from altering or adjusting the underlying arbitration award which did award certain damages under CASPA, and the trial court misapplied CASPA in its award of damages?

J-E03004-14

Appellants' Brief at 2-3.

## Discussion

Our standard and scope of review of a non-jury verdict are as follows.

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue … concerns a question of law, our review is plenary.

The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

*Stephan v. Waldron Electric Heating and Cooling LLC*, 100 A.3d 660, 664-665 (Pa. Super. 2014) (citation omitted). "[A]bsent an abuse of discretion, the reviewing court is bound by the trial court's credibility determinations." *De Lage Landen Financial Services, Inc. v. M.B. Management Co., Inc.*, 888 A.2d 895, 898 (Pa. Super. 2005) (citation omitted).

### Recusal

In their first issue, Appellants aver that Judge Rogers erred in not granting their motion to recuse the entire bench of the Montgomery County Court of Common Pleas after the close of the damages trial. Although they

20

concede that there is no evidence that Judge Rogers showed bias, unfairness or prejudice, Appellants nevertheless argue that because Judge Branca continued to have a connection with the case after his election to the bench, the mere appearance of impropriety existed such that recusal of the entire bench was required. Appellants have waived this argument for failing to timely raise it at the first possible opportunity.

"A party seeking recusal or disqualification [is required] to raise the objection at the *earliest possible moment*, or that party will suffer the consequence of being time barred." **In re Lokuta**, 11 A.3d 427, 437 (Pa. 2011) (emphasis added) (quoting **Goodheart v. Casey**, 565 A.2d 757, 763 (Pa. 1989)). Once a party has waived the issue, "he cannot be heard to complain following an unfavorable result." **Commonwealth v. Stanton**, 440 A.2d 585, 588 n.6 (Pa. Super. 1982) (citations omitted).

Here, Appellants had two opportunities to seek recusal before they eventually filed their motion. The first opportunity occurred before trial in January 2007 when Judge Rogers informed the parties of Judge Branca's prior representation and assured them of his (Judge Rogers's) ability to remain fair and impartial. Appellants' second opportunity to seek recusal occurred on September 6, 2007, immediately after Judge Branca testified regarding his past and current involvement with the case.

Appellants contend that it was on September 6, 2007, that they first learned that Judge Branca had maintained an interest in the case. As a

result, Appellants argue that September 6, 2007, was the "earliest possible moment" in which they should have filed their recusal motion. ***In re Lokuta***, 11 A.3d at 437. However, rather than file an immediate recusal motion, Appellants allowed the trial to proceed with testimony from three more witnesses including, most significantly, Appellant Kravitz. ***See*** N.T., Damages Trial, 9/6/07, at 65-83. As noted, Kravitz's testimony appeared extremely evasive and fabricated. It was only *after* this negative development that newly-retained counsel appeared and filed Appellants' recusal motion. To be more specific, it was not until Appellants requested a post-hearing thirty-day review of the attorneys' bills, and the thirty-day period had passed without Appellants filing any relevant documents, *and not until the record had closed*, that newly-retained counsel appeared and filed the recusal motion.

This action, or lack of action, is unacceptable and untimely. Judge Rogers told Appellants' counsel of Judge Branca's earlier involvement in the litigation prior to trial. Appellants took no action to question Judge Branca on the extent of his involvement, either informally or formally through a deposition. Appellants could have easily found out about Judge Branca's continued financial interest by just asking him. Instead, "Appellant[s] chose to remain silent, resorting to the unconscionable and reprehensible tactic of laying in the grass, waiting until the decision [was imminent], and then raising the disqualification issue[.]" ***Goodheart***, 565 A.2d at 763. Because

Appellants failed to timely raise their motion, they waived the recusal issue. *See*, *e.g.*, *Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864, 871-872 (9th Cir. 1991) (delay of six weeks rendered motion untimely); *Apple v. Jewish Hosp. and Medical Center*., 829 F.2d 326, 334 (2d Cir. 1987) (noting a delay of two months after movant learned of facts allegedly requiring recusal rendered motion untimely). *See also In re International Business Machines Corporation*, 45 F.3d 641, 643 (2d Cir. 1995).

Every jurisdiction has recognized that disqualification of a judge is waivable, and "if a party knows of facts that would disqualify a judge, but does not move for disqualification, the right to do so at a later date will be considered waived." James J. Alfini et al., *Judicial Conduct and Ethics* § 4.14 (4th ed. 2007). Paramount among concerns about an untimely motion to disqualify a judge is a party's late attempt to judge shop: "Given the importance of court proceeding, not to mention their time and expense, a party should not be able to save an objection until a later date as a hedge against losing a case." *Id*.

Among other citations, the treatise cites to a Pennsylvania decision, *Reilly by Reilly v. Southeastern Pennsylvania Transp. Authority*, 479 A.2d 973 (Pa. Super. 1984), *aff'd*, 489 A.2d 1291 (Pa. 1985), for the well settled policy that a motion for the disqualification of a judge "should be made at the earliest possible time after a party has actual notice of disqualifying facts."

Our opinion in **Reilly**, as well as the Pennsylvania Supreme Court's opinion in the same case, clearly mandates the necessity of a timely motion for disqualification.

In **Reilly**, the Superior Court concluded that the defendant SEPTA had not timely filed its Motion for Recusal because it had not been raised during trial and was only raised for the first time during post-appeal pleadings. The panel found broad support in the holdings of federal and state decisions.

> If the party fails to object at the earliest opportunity following receipt of actual knowledge, the objection will be held waived. A party may not elect to take a chance on gaining a favorable decision and then, if the decision is unfavorable, raise grounds for recusal of which he or his counsel had actual knowledge prior to the decision being made. **See Delesdernier v. Porterie**, 666 F.2d 116 (5th Cir.) … (motion untimely when judge made disclosure of relationship pre-trial and recusal motion was made for first time on appeal after two full trials); **Potashnick v. Port City Construction Co.**, [609 F.2d 1101 (5th Cir) … (grounds for recusal raised for first time on appeal not waived because it was not discovered until after trial); **United States v. Conforte**, 624 f.2d 869 (9th Cir.) … (cannot raise grounds for recusal for first time on appeal when had notice of facts earlier -- timeliness cannot be disregarded in all cases, although it may be in extraordinary cases); **Smith v. Danyo**, 585 F.2d 83 (3d. Cir. 1978) (timeliness is significant because cannot tolerate litigant knowing information and holding back hoping for favorable rulings and then seeking recusal when rulings are not favorable; recusal motion filed three months after events giving rise to objection but before trial and when there had been no rulings in meantime is timely); **United States v. Kelly**, 519 F.Supp. 1029 (D.Mass. 1981) (motion untimely where attorney had knowledge of facts but waited until after six week trial, mistrial and Rule 29(c) motion to file recusal motion); **Commonwealth v. Pavkovich**, 444 Pa. 530, 283 A.2d 295 (1971) (was error for judge who had been prosecuting attorney to sit on court en banc in deciding post-trial motions, but no objection was raised prior to appeal); **Commonwealth v. Musto**, 348 Pa. 300, 35 A.2d 307 (1944) (defendant waived objection when he proceeded to

24

> trial without objection, despite knowledge that judge may have been a witness); ***Commonwealth v. Bahl***, 111 Pa. Super. 598, 170 A. 346 (1934) (motion untimely when judge made disclosure before Plaintiff completed his case and motion was made at end of defendant's case).

479 A.2d at 988.

Further, even if the issue were not waived, we cannot agree with the Dissent's overstated conclusion that there was an inherent appearance of impropriety in Judge Rogers presiding over this case. While the appearance of impropriety alone is enough to warrant recusal, recusal must occur only under appropriate circumstances. Those circumstances were not present here.

The party who asserts that a trial judge must be disqualified must "produce evidence establishing bias, prejudice, or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially." ***Arnold v. Arnold***, 847 A.2d 674, 680 (Pa. Super. 2004) (citation omitted). There is a presumption that judges of this Commonwealth are "honorable, fair and competent," ***In re Lokuta***, 11 A.3d at 453 (Pa. 2011) (citation omitted), and, when confronted with a recusal demand, are able to determine whether they can rule "in an impartial manner, free of personal bias or interest in the outcome," ***Arnold***, 847 A.2d at 680 (citation omitted). If the judge determines he or she can be impartial, "the judge must then decide whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the

25

judiciary. This is a personal and unreviewable decision that only the jurist can make." ***Id***., at 680-681 (citation omitted). A judge's decision to deny a recusal motion will not be disturbed absent an abuse of discretion. ***See In re Lokuta***, 11 A.3d at 435.

Here, Appellants presented no evidence that established bias, prejudice, or unfairness which raised a substantial doubt as to Judge Rogers's ability to preside impartially.

Our Supreme Court has recognized that it

> would be an unworkable rule which demanded that a trial judge recuse whenever an acquaintance was a party to or had an interest in the controversy. Such a rule ignores that judges throughout the Commonwealth know and are known by many people, … and assumes that no judge can remain impartial when presiding in such a case.

***Commonwealth v. Perry***, 364 A.2d 312, 318 (Pa. 1976). ***See also Korner v. Warman***, 659 A.2d 83, 85 (Pa. Cmwlth. 1995) (finding no reason for recusal "just because a fellow county judge is allegedly implicated in a case, where the trial judge foresees no problems with impartiality[]"). Moreover,

> [w]hile the mediation of courts is based upon the principle of judicial impartiality, disinterestedness, and fairness pervading the whole system of judicature, so that courts may as near as possible be above suspicion, *there is, on the other side, an important issue at stake: that is, that causes may not be unfairly prejudiced, unduly delayed, or discontent created through unfounded charges of prejudice or unfairness made against the judge in the trial of a cause*. It is of great importance to the administration of justice that such should not occur. If the judge feels that he can hear and dispose of the case fairly and without prejudice, his decision will be final unless there is an abuse of discretion. This must be so for the security of the bench and the successful administration of justice. Otherwise, unfounded and

ofttimes malicious charges made during the trial by bold and unscrupulous advocates might be fatal to a cause, or *litigation might be unfairly and improperly held up awaiting the decision of such a question or the assignment of another judge to try the case*. If lightly countenanced, such practice might be resorted to, thereby tending to discredit the judicial system. The conscience of the judge alone is brought in question; he should, as far as possible, avoid any feeling of unfairness or hostility to the litigants in a case.

**Reilly by Reilly**, 489 A.2d at 1299 (emphasis added).

Appellants and the Dissent rely on **Commonwealth ex rel. Armor v. Armor**, 398 A.2d 173 (Pa. Super. 1978) (*en banc*) (plurality), in support of the assertion that recusal of the entire bench is required. Initially, we note that **Armor** provides no precedential value regarding the issues of recusal and appearance of impropriety by a trial court.[11]

In **Armor**, a father filed a petition with the Montgomery County Court of Common Pleas to reduce his child support obligation. The day before the

---

[11] Although **Armor** was written by Judge Price, in relation to the issues of recusal and appearance of impropriety, one judge concurred and one judge *concurred in the result only*. Three judges explicitly dissented from Judge Price's holding that no judge of the Montgomery County bench could hear the child support case, *i.e.*, Judge Cercone in his concurring and dissenting opinion, and Judge Wieand, joined by Judge Hester, in his dissenting opinion. Therefore, not only is **Armor** a plurality opinion, which carries no binding authority, the majority holding was not joined by a sufficient number of judges to warrant precedential value. **See Interest of O.A.**, 717 A.2d 490, 496 n.4 (Pa. 1998) ("While the ultimate order of a plurality opinion, *i.e.*, an affirmance or reversal, is binding on the parties in that particular case, legal conclusions and/or reasoning employed by a plurality certainly do not constitute binding authority."); **Commonwealth v. Brown**, 23 A.3d 544, 556 (Pa. Super. 2011) (*en banc*) ("Where, as here, however, the concurrence does not explicitly state its agreement or disagreement with the plurality, we must look to the substance of the concurrence to determine the extent to which it provides precedential value to points of agreement.").

hearing, he moved for a change of venue, asserting that because his former wife was (1) married to a judge on the bench, and (2) represented by the county controller, any hearing within Montgomery County would create the appearance of impropriety. The trial court denied the motion for a change of venue and dismissed the petition. On appeal, the Superior Court opined that the father *could* receive a fair and impartial hearing in Montgomery County. We nonetheless vacated the trial court's orders, stating:

> [W]e should not approve the procedure whereby any of the judges of the Court of Common Pleas of Montgomery County are called upon to rule on matters relating to wife-appellee's child support matters. Such actions would, in our opinion, tend to weaken the public confidence in a court that has established an enviable record in its performance and service to Montgomery County and its citizens. Pursuant to Canon 1 of the Code of Judicial Conduct such action would be contrary to the appearance of integrity and independence of the judiciary which we are charged with preserving.
>
> Further, we believe that such action is contrary to Canon 2 of the Code of Judicial Conduct in that it does not promote public confidence in the integrity and impartiality of the judiciary.

*Id*., at 174.[12]

---

[12] Appellee responds by reiterating the trial court's opinion that **Armor** had been "abrogated" when the Supreme Court declined, in a *per curiam* order, to take the opportunity to "uphold the presumptive standard articulated in **Armor**" and thus, "specifically rejected it." Appellee's Brief, at 18 (citing ***In re Estate of Brockerman***, 480 A.2d 1199, 1201 n.3 (Pa. Super. 1984)). The Supreme Court did not issue an opinion with its remand order in **Brockerman**. It cannot be said that **Armor** has been "abrogated" by **Brockerman** or that our Supreme Court's action in **Brockerman** has any precedential value. **See Commonwealth v. Thompson**, 985 A.2d 928, 937-938 (Pa. 2009) (citing case law for the proposition that *per curiam* orders hold no precedential authority).

28

Contrary to Appellants' contention, the ***Armor*** ruling does not create a presumption that in *all* cases where a member of the bench has an interest the *entire* bench must be recused. Rather, the ***Armor*** decision confirms the principle that review of recusal determinations is to be made on a case-by-case basis in light of the specific underlying facts, the nature of the interest, and the relationship of the entire bench to that interest. As stated by the Honorable Donald Wieand in his dissent, which expressed the consensus of half of the judges in ***Armor***:

> The public expects and has a right to demand a high degree of integrity and ethical responsibility on the part of its judges. There can be no doubt that all judicial proceedings must be free from appearances of impropriety. Therefore, a judge should not participate in proceedings in which his or her objectivity and impartiality are likely to be impaired. On the other hand, the public also expects courage and independence on the part of its judges. It is the individual judge who must in the first instance determine whether in good conscience and judgment he or she can hear a dispute objectively and impartially, or whether there should be a recusal. His or her decision will not be disturbed unless there is an abuse of discretion. The public is entitled to the independent judgment of its judiciary and should not be denied that judgment by unsupported claims of partiality.
>
> In my judgment, public confidence in the judiciary will be strengthened, not weakened, by respecting and upholding the trial judge's determination that he could hear and decide the instant case impartially. Public confidence is not weakened because judges are called upon to hear and decide difficult and controversial cases. The public does expect, however, that judges will rise above any influence which is inherent in the high or low estate of litigants who come before them. Courage and integrity are the hallmarks of an independent judiciary. More often than we like to contemplate, it is recusals too readily tendered in complex and controversial cases which weaken public respect for the judiciary.

***Id***., at 178 (internal citation omitted).

29

Furthermore, in **Armor**, the motion was made before the hearing, not after the record had been closed, as in the case before us now. Here, the Appellants had the advantage of knowing that Judge Rogers had ruled against them in the liability portion of the trial, and that the testimony of Kravitz was appalling when he tried to hide his assets and divert funds to frustrate the court's award.

Our Code of Judicial Conduct "set[s] a norm of conduct for all our judges and do[es] not impose substantive legal duties on them." **Commonwealth v. Druce**, 848 A.2d 104, 109 (Pa. 2004) (citation omitted). While Judge Branca's discussions of the case with Appellee's counsel may or may not raise a personal ethical issue under our Code of Judicial Conduct, the circumstances here do not provide a legal or ethical reason to impugn the impartiality of the entire bench of the Montgomery Court of Common Pleas or that of Judge Rogers. **See id**. As noted above, before the trial got underway in January 2007, Judge Rogers discussed with counsel, and specifically with Appellants' counsel, the issue of now-Judge Branca having previously represented Appellee. Most significantly, Judge Rogers gave assurances to the parties that he had never discussed the case with Judge Branca, and all counsel unequivocally agreed to proceed before Judge Rogers.

There is no dispute that Judge Rogers was fair and impartial at all times. We repeat, Appellants concede that there is no evidence that Judge

Rogers showed bias, unfairness, or prejudice. We, therefore, conclude that even if the motion for recusal had been timely raised, Judge Rogers did not abuse his discretion in denying Appellants' motions to recuse, change venue, or assign an out-of-county judge.

The result advocated by the Dissent, that the damages verdict should be vacated and the case remanded for a new trial, is unfair and an improper exercise of judicial power. The Dissent's position would be extremely prejudicial to Appellee in that it would place Appellee at a distinct disadvantage in this 20-year-old litigation. The trial judge who heard the evidence and made findings relevant to the liability decision would not be the judge who addresses the damages portion of the case. The credibility decisions, the observations of the witnesses and other evidence, and the conclusions reached by the trial judge in the liability phase would be rendered meaningless because another judge would have to hear and decide the damages portion of the case. If this were caused by necessity, such as the retirement or death of a trial judge, then we would not have any concerns. However, to remove the trial judge midstream, on an issue that was easily discoverable by Appellants prior to trial would be unfair and unprecedented.

### Admission of Expert's Report

Appellants aver that "the trial court erred in admitting and relying upon testimony of Plaintiff's expert" because "Judge Branca improperly

influenced key aspects of Mr. Dovell's report." Appellant's Brief at 34. At no time prior to this appeal have Appellants specifically averred that the expert's testimony was inadmissible or unreliable.[13] As the trial court noted, although Appellants raised 57 errors in their Motion for Post-Trial Relief, they did not assert that the trial court erred in admitting and relying on the report. Arguments not raised below are waived for purposes of appeal. **See** Pa.R.A.P. 302(a). Accordingly, this issue was not preserved and is therefore waived on appeal.[14]

**Piercing the Corporate Veil**

Appellants maintain that their non-cash accounting methods, "made for the purpose of minimizing Kravitz's personal tax burden [and having] no effect on Cherrydale's ability to pay its creditors," could not be used to hold Appellants Kravitz, Andorra, and Eastern liable for the judgment against Cherrydale. Appellants' Brief at 37 (citing **Gregory v. Helvering**, 293 U.S. 465, 469 (1935)).

---

[13] In their motion for recusal and motion for reconsideration of the recusal motion, Appellants asserted only that Judge Branca gave his opinion on the report to Appellee's attorney during a telephone discussion about the case. At no time prior to this appeal did Appellants argue that the report had been improperly admitted and did not seek preclusion of the report or the expert's testimony. In their motion for post-trial relief, Appellants again did not argue that the trial court improperly admitted or relied upon the expert or testimony.

[14] Moreover, even if the issue had not been waived, as the trial court observed, "there is no evidence to support an assertion that Judge Branca, or anyone else, improperly influenced" the content of the expert's report. Trial Court Opinion, dated 1/15/13, at 30-31.

Piercing the corporate veil provides a "means of assessing liability for the acts of a corporation against an equity holder in the corporation." *Village at Camelback Property Owners Assn. Inc. v. Carr*, 538 A.2d 528, 532 (Pa. Super. 1988), *aff'd*, 572 A.2d 1 (Pa. 1990) (*per curiam*).

> The legal fiction that a corporation is a legal entity separate and distinct from its shareholders was designed to serve convenience and justice, and will be disregarded whenever justice or public policy require and where rights of innocent parties are not prejudiced nor the theory of the corporate entity rendered useless. We have said that whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate corporate identity may properly be disregarded.

*Id*., at 532-533 (citations omitted).

"[T]here is a strong presumption in Pennsylvania against piercing the corporate veil." *Lumax Industries, Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995). We consider the following factors when determining whether to pierce the corporate veil: (1) undercapitalization; (2) failure to adhere to corporate formalities; (3) substantial intermingling of corporate and personal affairs, and (4) use of the corporate form to perpetrate a fraud. *See id*. The "legal fiction of a separate corporate entity was designed to serve convenience and justice, and will be disregarded whenever justice or public policy demand and when the rights of innocent parties are not prejudiced nor the theory of corporate entity rendered useless." *Ashley v. Ashley*, 393 A.2d 637, 641 (Pa. 1978) (citations omitted).

Appellants cite *Gregory* as illustrative of their position that the corporate veil cannot be pierced and transactions cannot be considered fraudulent when they are "motivated by the desire to achieve the best possible tax benefit." Appellants' Brief at 37. In *Gregory*, a taxpayer "reorganized" her business in accordance with the applicable statute to obtain cash from her business and avoid a tax liability. The United States Supreme Court affirmed the tax commissioner's determination that the "reorganization" was without substance and the tax payer was liable for tax as if she had been paid a dividend. The United States Supreme Court recognized that a taxpayer has a legal right to decrease the amount of what would be his or her taxes or avoid them all together "by means which the law permits" but noted that the "rule which excludes from consideration the tax avoidance is not pertinent to the situation" because the "reorganization" at issue had been an "elaborate and devious form of conveyance masquerading as a corporate reorganization." 293 U.S. at 470.

The trial court's extensive findings of fact meticulously detail the numerous transactions Appellant Kravitz orchestrated among Cherrydale, Andorra Springs, Eastern, and other entities so as to render Appellant Kravitz's alleged motive of tax avoidance not pertinent. As the trial court observed:

> But for Kravitz's direction that Andorra Springs loan money to Eastern and Kravitz's other entities and his subsequent direction that Andorra Springs not repay Cherrydale for its intercompany loans, Cherrydale would have realized a profit of approximately

34

$250,000 in 1996. [ ] Cherrydale was profitable as reflected by the tax returns, but it ultimately did not pay its creditors because it was not paid by Andorra Springs, nor was it repaid for loans made by it to Kravitz and his other entities. [ ] Andorra Springs' 1996 tax return and Kravitz's tax planning papers demonstrate that, but for Kravitz's direction[ ] that Eastern and the other entities not repay their loans to Andorra Springs, Andorra Springs would have realized a profit of more than $2.1 million. Had Andorra Springs retained the monies it made on home sales rather than lend those monies to Eastern and Kravitz's other entities, Andorra Springs would have had sufficient funds to pay Cherrydale. [ ] Had Eastern not lent monies to other Kravitz entities, whose purposes had nothing to do with constructing or selling homes in the Reserve, Eastern would have had money with which to pay Andorra Springs. [ ] Kravitz personally authorized the intercompany loans, declared the companies insolvent, distributed the capital to himself and authorized the write-off of the loans – all for his personal benefit and to the detriment of creditors like [Appellee].

* * *

[ ]In his capacity as President and sole-shareholder, Kravitz was … the only person within the Andorra Group with the authority to bind the corporations to loans or other contracts. [He] signed the tax returns for Cherrydale[, Andorra Springs, and Eastern] for 1994 through 1998 and caused the returns to be filed. [ ] Kravitz personally directed that Andorra Springs' intercompany payables' be cancelled.

* * *

[ ]As a result of his sale of properties to Pulte and others in 1996, Kravitz had significant taxable income in 1996. [ ] Without the Andorra Group's bad debt deductions, Kravitz would have been required to pay over a million dollars in tax. [ ] Because of the Andorra Group's bad debt deduction, Kravitz paid only $3,734 in tax. [ ] The series of Adjusting Journal Entries made at the end of 1996 was to the companies' detriment and to the benefit of Kravitz, in that the entries allowed Kravitz (1) not to pay creditors of the Andorra Group companies and (2) to retain the value of the Andorra Group corporations through transfers of improvements, capital distributions and write-offs of loans made to himself and his horse farm.

Findings of Fact – Liability at 32-33, 35-37, ¶¶ 135-139, 144-157 (internal paragraph numbers, headings and citations to Reproduced Record omitted).

Based on our thorough review of the record and relevant case law, we conclude that the trial court's findings of fact are supported by the record and its conclusions of law contain no error. There is sufficient evidence in the record showing that (1) Cherrydale had been undercapitalized; (2) Kravitz had failed to adhere to corporate formalities; (3) there was extensive intermingling of the various corporations' funds; and (4) Appellant had used the corporate form to perpetuate a fraud, specifically, to remove assets from the reach of creditors, like Appellee. *See Lumax Industries, Inc.*

We also note that Appellants' arguments against piercing the corporate veil are based entirely on a self-serving recitation of the evidence, with particular emphasis on the testimony of their corporate accountant, which the court found to be not credible. It is well-settled that a fact-finder's credibility determinations may not be overturned by a reviewing court as long as there is sufficient evidence in the record to support those determinations. *See In re Merlo*, 58 A.3d 1, 27 (Pa. 2012). We conclude that the court's credibility determinations are supported by the record and are not "manifestly erroneous, arbitrary and capricious or flagrantly contrary to the evidence." *J.J. DeLuca Company, Inc. v. Toll Naval Associates*, 56 A.3d 402, 410 (Pa. Super. 2012).

**Punitive Damages**

Appellants aver that the trial court erred in awarding punitive damages because "there was no evidence of outrageous, willful, wanton or reckless conduct," and fraudulent conduct alone is not enough upon which to base punitive damages. Appellant's Brief at 41. They also argue that the punitive damages award is unconstitutionally disproportionate to the award of compensatory damages.[15]

In reviewing challenges to punitive damage awards, we determine whether the trial court has committed any abuse of discretion or whether after a complete and exhaustive review of the record, the award shocks the court's sense of justice. **See *Empire Trucking Co., Inc. v. Reading Anthracite Coal Co.***, 71 A.3d 923, 938 (Pa. Super. 2013).

Punitive damages are awarded to punish a person and/or entity for "outrageous conduct." ***Kirkbride v. Lisbon Contractors, Inc.***, 555 A.2d 800, 802 (Pa. 1989) (citing Restatement (Second) Torts § 908(1)). Conduct is considered "outrageous" where a defendant's actions shows either "an evil motive or reckless indifference to the rights of others." ***J.J. DeLuca Company, Inc.***, 56 A.3d at 415-416 (citation omitted).

---

[15] In addition, Appellants provide a three-sentence argument that because CASPA allows for "penalty damages, as a matter of law the trial court was prohibited from awarding common law punitive damages." Appellants' Brief, at 49. Appellants cite inapposite and non-precedential case law and fail to develop their argument. We, thus, conclude this argument is waived and, in any event, without merit.

"Reckless indifference to the interests of others", or as it is sometimes referred to, "wanton misconduct", means that the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.

**McClellan v. Health Maintenance Organization of Pennsylvania**, 604 A.2d 1053, 1061 (Pa. Super. 1992) (citations omitted).

The determination of whether a person's actions arise to outrageous conduct lies within the sound discretion of the fact-finder and will not be disturbed on review, provided that discretion has not been abused. **See J.J. Deluca Company, Inc.**, 56 A.3d at 416. Our review is informed by the following principles:

Under Pennsylvania law the size of a punitive damages award must be reasonably related to the State's interest in punishing and deterring the particular behavior of the defendant and not the product of arbitrariness or unfettered discretion. In accordance with this limitation, the standard under which punitive damages are measured in Pennsylvania requires analysis of the following factors: (1) the character of the act; (2) the nature and extent of the harm; and (3) the wealth of the defendant.

We review such an award for an abuse of discretion. In addition, in the face of a constitutional challenge, we conduct a *de novo* review "to determine whether it comports with the Due Process Clause of the Fourteenth Amendment to the United States Constitution."

**Grossi v. Travelers Personal Insurance Co.**, 79 A.3d 1141, 1157 (Pa. Super. 2013) (quoting **Hollock v. Erie Insurance Exchange**, 842 A.2d 409, 420 (Pa. Super. 2004)), *appeal denied*, 101 A.3d 103 (Pa. 2014) (citations omitted).

Our review of the record in this case discloses that the trial court's award of punitive damages award is sufficiently supported by the record. We need not reiterate the trial court's extensive and detailed findings of fact that support its proper legal conclusion that Appellants' conduct was outrageous and demonstrated a reckless indifference to the rights of others. *See* Findings of Fact – Liability at 1-64; Findings of Fact – Attorneys' Fees and Damages at 5-9. As soon as the interim arbitration award of $31,000 was entered against Cherrydale in 1996, Kravitz began a steady and persistent campaign to avoid paying Appellee. The campaign that has continued for nearly 20 years and has involved not only fraudulent transfers of assets as noted above, but years of incessant use and abuse of our civil litigation processes.

Appellants contend that they were simply using acceptable litigation strategies within their rights, but they fail to acknowledge that many of their motions and petitions were procedurally and/or legally without support and appear to have been designed to wear Appellee down with delay and expense. These filings included, but were not limited to, impermissible interlocutory appeals with both this Court and our Supreme Court; a frivolous petition to disqualify Appellee's attorney; unnecessary demands for additional days of discovery, followed by redundant and irrelevant discovery requests; a summary judgment motion which completely disregarded Appellant's prior representation that questions of law existed which

precluded summary judgment; numerous requests for trial delays; and a request for a thirty-day post-trial time for review, which passed with no communication at all from Appellants.

Moreover, even though Appellants had been well-aware of Judge Branca's involvement in this case since 1995, and had informed the trial court that his prior representation of Appellee was a non-issue with respect to the trial proceeding in Montgomery County before Judge Rogers, Appellants nevertheless requested recusal of the entire bench *after* the close of evidence. Appellants' actions over nearly 20 years, combined with Kravitz's abuse of corporate forms and accounting methods to avoid paying what is rightfully owed to Appellee, present a fact pattern that paints the very picture of outrageous conduct. We conclude that the trial court did not abuse its discretion in awarding punitive damages.

With respect to Appellants' claim that the proportionality of punitive damages to compensatory damages violated their right to due process, Appellants acknowledge that the United States Supreme Court has "yet to impose a hard-and-fast limitation" on the ratio between punitive and compensatory damages. Appellants' Brief, at 50. Appellants nevertheless contend, without citation to any definitive pronouncements by any federal court, that the "trial court's award of punitive damages exceeds the federal Constitutional limits of a 1:1 ratio." Appellants' Brief at 50. Appellants grossly misstate the law.

The United States Supreme Court has stated:

[W]e have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.

*State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 424-425 (2003) (citation omitted).

Here, the trial court awarded compensatory damages in the amount of $200,601.61 and punitive damages of $601,804.83, a ratio of 3:1. This comports with the single-digit ratio. In light of the circumstances of this case detailed above and our review of the relevant law, we discern no abuse of discretion or constitutional infirmity in the award of punitive damages.

Appellants also argue that the trial court awarded punitive damages based only on its findings of fraud and fraudulent transfer, in derogation of *Pittsburgh Live, Inc. v. Servov*, 615 A.2d 438 (Pa. Super. 1992), and Pennsylvania's Uniform Fraudulent Transfer Act, 12 Pa.C.S.A. §§ 5101-5110. In support, Appellants reiterate their witnesses' testimony. In essence, Appellants argue that the trial court erred in not accepting their interpretation of the facts of this case.

In *Pittsburgh Live*, the Superior Court reversed the trial court's award of punitive damages after concluding that although there had been

41

fraudulent conduct which supported the compensatory damage award, there had been no acts which had been wanton or vindictive, or which had showed a wanton disregard for the rights of others so as to support an award of punitive damages. *See* 615 A.2d at 442. Here, contrary to Appellants' averments, punitive damages were based on a determination that they *had* acted with a wanton disregard for the rights of others. This finding is amply supported by the record. Accordingly, this argument is without merit.

### Attorney's Fees, Penalities, and Interest

The trial court assessed interest, penalties, and attorney's fees as follows:

a. Partial Judgment ……………………………………..…… $ 200,601.61

b. Interest on Judgment pursuant to CASPA (73 P.S. § 505(d))[ ]
in the amount of 1% per Month from September 8, 1998
through April 30,2011 ………..………………………… $ 306,467.55

c. Penalty on Judgment pursuant to CASPA (73 P.S. §512(a))
in the amount of 1% per Month from September 8,1998
through April 30, 2011 ………………………………..… $ 306,467.55

d. Attorney's Fees and Costs pursuant to CASPA (73 P.S.
§ 512(a)(b)) from September 8, 1998 through August 15,
2007 ………………………………………………………….. $ 273,037.65

e. Punitive Damages …………………………………….… $ 601,804.83

f. Interest shall continue to accrue pursuant to CASPA at 1% per month from May 1, 2011 in the amount of $131.90 per day until paid in full.

**Final Judgment against All Defendants as of April 30, 2011:**

**TOTAL ……………………………………………………… $1,688,379.10**

Order Sur: Assessment of Damages, dated April 29, 2011 (footnote to case law omitted).

Appellants contend that the trial court's grant of attorney's fees, penalties and interest represent an impermissible modification of the arbitration award and should not have been allowed because Appellee had not stated a cause of action under CASPA in the instant case. **See** Appellants' Brief at 51. They also argue that the interest should have been calculated in accordance with the arbitration panel's directive and not based on that panel's final award.

CASPA was enacted in 1994 to cure abuses within the building industry involving payments due from owners to contractors and subcontractors and "to encourage fair dealing among the parties to a construction contract." **Zimmerman v. Harrisburg Fudd I, L.P.**, 984 A.2d 497, 500-501 (Pa. Super. 2009) (citation omitted). Because "CASPA is a remedial statute, we must accord it a liberal construction to effect its objects and to promote justice." **Id**., at 502 n.8 (citations omitted). CASPA provides that "[i]f arbitration or litigation is commenced to recover payment due under this act … the arbitrator or court shall award, in addition to all other damages due, a penalty equal to 1% per month of the amount that was wrongfully withheld." 73 P.S. § 512.

As the trial court observed, the instant action, like the underlying arbitration proceeding, was "a proceeding to recover" payment due under

CASPA. After the trial court determined that piercing the corporate veil was appropriate in order to execute on the judgment due and owing, which was then the final arbitration award of $200,601.61, Section 505(d) was implicated against Appellant Kravitz as owner of Cherrydale and the other involved subcorporations. The trial court's calculations were properly based on CASPA. *See* 73 P.S. §§ 505(d) and 512. Accordingly, we find no error in the trial court's calculation of interest and penalties.

With respect to the attorney's fees imposed by the trial court, the trial court's award of attorney's fees covers the period from September 8, 1998, after the arbitration award was issued, through August 15, 2007, and includes those incurred in connection with the instant litigation. Contrary to Appellants' averment, these fees do not represent a modification of the arbitration award.

Judgment affirmed.

President Judge Emeritus Bender, Judge Lazarus, and Judge Wecht join this majority opinion.

Judge Stabile files a concurring and dissenting opinion in which Judge Bowes, Judge Donohue, and Judge Shogan join.

Judge Allen did not take part in the consideration or decision of this case.

44

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>12/21/2015</u>