J-A33017-15

2016 PA Super 202

| | |
|---|---|
| B.G. BALMER & CO., INC. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| FRANK CRYSTAL & COMPANY, INC., ERIC HAMPLE, BRIAN COURTNEY, BRUCE EINSTEIN, PETER REILLY AND C. RICHARD PETERSON | |
| Appellants | No. 3444 EDA 2013 |

Appeal from the Judgment entered November 12, 2013
In the Court of Common Pleas of Chester County
Civil Division at No: No. 2003-09686-IR

BEFORE:  FORD ELLIOTT, P.J.E., STABILE, and STRASSBURGER,[*] JJ.

OPINION BY STABILE, J.:                    **FILED SEPTEMBER 09, 2016**

In this appeal, Appellants/defendants Frank Crystal & Company, Inc., Eric Hample, Brian Courtney, Bruce Einstein, Peter Reilly, and C. Richard Peterson (individually "FCC," "Hample," "Courtney," "Einstein," "Reilly," and "Peterson," and collectively "Appellants") challenge the Court of Common Pleas of Chester County's ("trial court") award of compensatory and punitive damages in favor of Appellee/plaintiff Barry G. Balmer & Co., Inc.  ("Balmer" or "Balmer Agency").  Upon review, we affirm.

The facts and procedural history underlying this case are undisputed. As recounted by the trial court:

_____

[*] Retired Senior Judge assigned to the Superior Court.

The Balmer Agency, established in 1967, is a Pennsylvania corporation engaged in the business of insurance brokerage and was solely owned by its founder and president, Barry G. Balmer. After being in business for in excess of thirty (30) years, Balmer began to assemble a group of employees that eventually would assume control of the Balmer Agency. B[arry] Balmer was president; Gail Masayko was vice president of finance and systems (which included human relations responsibilities); and Bruce Constanzar was chief operations officer. In 1999, Balmer hired [d]efendants Hample and Courtney as account executives. In 2000, Balmer hired [d]efendant Einstein as vice president of operations and [d]efendant Reilly as executive vice president. In 2001, Balmer hired [d]efendant Peterson as president of strategic planning. Defendants Einstein, Hample and Courtney reported to [d]efendant Reilly as their supervisor. When all [d]efendants were hired, as a condition of employment, each [d]efendant entered into the same valid and enforceable employment agreements containing a non–solicitation provision with restrictive covenants limiting permissible post[-]employment activities. The employment agreements require[d] that [d]efendants not solicit Balmer customers and active prospects during the four (4) years subsequent to the termination of their respective employment with Balmer. The agreements also prohibit[ed] [d]efendants from attempting to induce or from actually inducing Balmer clients, directly or indirectly, to terminate, cancel, discontinue or fail to renew insurance coverage through the Balmer Agency for that same four (4) year period. Further, Defendants [we]re not to use or disclose customer lists, policy information, prospect lists or other contractually defined information for that four (4) year period.

Defendants Reilly, Peterson and Einstein were members of the Balmer Agency executive committee. Defendant Peterson was a member of its advisory board as well. Balmer began to formulate a succession plan wherein control of the Balmer agency would eventually be transferred to [d]efendant Reilly, who would eventually run the agency. Defendant Reilly, in his position as senior executive vice president, created a business plan for the future of the Balmer Agency and Balmer hired a professor at the University of Pennsylvania, Eric Von Merkensteijn, as a consultant in creating this plan. This plan was referred to as the company's "Strategic Plan" and was presented to and discussed extensively by the executive committee in 2002 and 2003. Defendant Reilly created the Strategic Plan containing agency revenue, expenses and projected growth in consultation with Barry Balmer, Professor Von Merkensteijn and Defendant Peterson.

In 2001, Barry Balmer, [d]efendant Peterson and Steven Pazuk started a captive insurance company named Penn Capital Insurance Company ("PCIC"). The Balmer agency would place insurance for its customers through PCIC. Defendant Peterson was named president of PCIC in addition to his position as president of strategic planning. PCIC wrote insurance for

Balmer's largest and longstanding client, Wellington Investments, as well as Kaolin Mushroom and other clients.

In 2003, [d]efendants Reilly and Peterson began to conspire to entice employees to leave the Balmer agency and Balmer's clients and customers to a competing agency. Gail Masayko, who then worked at the Balmer Agency for 13 years, overheard [d]efendant Peterson state that ". . . he had people that were unhappy and that they were willing to move . . . and they also, had business to move." Defendant Reilly also told Masayko that his employment agreement would not "hold water" and that if things did not move along faster at the Balmer Agency he would take people and business and leave. These statements, made by these [d]efendants prior to July of 2003, are supportive of the trial [c]ourt's finding of conspiracy, malice and an intent to harm the Balmer Agency.

In December of 2002, Barry Balmer and [d]efendant Peterson met with Craig Richards, president of David Brook Associates, a major recruiter for the insurance brokerage business in New York City. Barry Balmer wanted to find new sales people to expand the Balmer Agency business. After meeting with Richards, B[arry] G. Balmer informed [d]efendants Peterson and Reilly that he did not wish to use the services of Craig Richards. However, [d]efendant Peterson continued to speak with Richards on his own. In May of 2003, [d]efendant Peterson met with Richards in New York City to discuss further employment opportunities and informed Richards that [d]efendant Reilly was unhappy at the Balmer Agency and was also looking for employment opportunities. Richards contacted [d]efendant Reilly and a meeting with Richards was arranged with [d]efendants Reilly and Peterson on June 4, 2003 to discuss employment opportunities, including opening up a Philadelphia office for a large insurance brokerage firm. During these discussions, Craig Richards was the primary employment recruiter for Defendant FCC. In 2003, FCC was a large New York based insurance brokerage company with annual revenues of approximately 66 million dollars. Following the June 4, 2003 meeting, [d]efendants Peterson and Reilly remained in New York City overnight and met the following day with the president and chief operations officer of FCC, Mark Freitas, to discuss employment opportunities, including the opening of a[n] FCC office in Philadelphia ("FCC Philadelphia"). Defendant Reilly subsequently disclosed to Richards trade secret information about Balmer Agency clients and customers that could be moved to FCC Philadelphia as well as the names of Balmer employees that he wished to join him at FCC Philadelphia. Those employees included Joe Valerio, Brian Courtney, Eric Hample, Bruce Einstein, Jennifer Little, Pavid Krause and Pennock Yeatman. This proposed team, including Reilly and Peterson, consisted of nine (9) of out a total of twenty (20) employees at Balmer and further consisted of all the insurance sales/marketing people at Balmer, other than B[arry] Balmer himself. All this information was passed on to FCC by Richards.

In May and June of 2003, all individual [d]efendants met with Craig Richards and/or FCC. On June 25, 2003, all individual [d]efendants, as well as Balmer employee David Krause, received letters from FCC confirming their acceptance of an offer to work for FCC starting on July 3, 2003. All were to make more income with FCC than when at the Balmer Agency. On June 25, 2003, all individual [d]efendants met in New York City to discuss their pending establishment of FCC Philadelphia. All individual [d]efendants arranged details of their employment with FCC while using Balmer Agency computers, office telephones, cell phones, fax machines and facilities and when on Balmer Agency employment time. Balmer Agency employee Krause did not join FCC.

Prior to all individual [d]efendants resigning employment from the Balmer Agency within a day of each other, [d]efendant Reilly refused to return [d]efendant Einstein's personnel file to Gail Masayko and attempted to acquire [d]efendants Courtney['s] and Hample's personnel files, but was unsuccessful. Defendant Einstein compiled various client lists and trade secret information regarding the Balmer Agency's Wellington account including coverage and policy information and took this information with him when leaving the employment of the Balmer Agency. Other client list trade secret information regarding Balmer Agency clients had previously been disclosed to FCC by [d]efendants. All individual [d]efendants took with them to FCC Philadelphia Balmer trade secret information and subsequently used that information when breaching their respective employment agreements. While Barry Balmer was on vacation for the 4th of July weekend in 2003, he received information that individual [d]efendants had resigned. FCC Philadelphia was operational on July 3, 2003. Within days of July 3, 2003, individual [d]efendants began to solicit Balmer Agency clients and customers in violation of their employment agreements. At least 24 Balmer Agency customers or prospects were solicited by using trade secret information. All of these efforts were to benefit FCC. Shortly after the resignations of individual [d]efendants, additional Balmer Agency employees were either terminated or resigned as a direct result of the individual [d]efendants' departure and the resultant adverse impact on Balmer Agency business.

The record is replete with the individual [d]efendants contacting Balmer Agency clients and customers in an attempt to solicit and/or transfer those insurance businesses to FCC Philadelphia. The contacts in violation of their respective employment agreements are extensive. The most obvious and documented contractual violation engaged in by [d]efendants involves the Wellington account. That account had been a client of the Balmer Agency for over twenty-six (26) years and was its largest and most lucrative client. Shortly after all individual [d]efendants resigned from their employment with Balmer, [d]efendant Einstein, who had close contact with the Wellington account while at the Balmer Agency, contacted Wellington and

- 4 -

set up a meeting with Wellington executives. Defendants Einstein, Reilly and Sanford F. Crystal, executive vice president of FCC who had FCC responsibility to gain Wellington as a client, all traveled to Boston, Massachusetts on August 12, 2003 to solicit the Wellington account for FCC. Defendants Einstein and Reilly prepared an agenda for this meeting which included providing an explanation to Wellington how the Balmer Agency did not honor its succession commitment to them; bullet points to discuss the integrity/personal reputation of B[arry] Balmer and the Balmer Agency; and an introduction of FCC and the different services that can be provided by FCC. An examination of the meeting agenda makes it clear that Defendants were there to solicit the Wellington business by promoting FCC and tarnishing B[arry] Balmer and the Balmer Agency. The last sentence of the agenda states: "We are committed to resolving issues for Wellington and are best able to b[y] reason of market knowledge and knowledge of the client"

Defendants' contact with Wellington is a prime example of individual [d]efendants' breach of their employment agreements, use of Balmer trade secret information, the conspiratorial nature of the actions of all [d]efendants and the attempt to destroy Balmer Agency business relationships. The August 12, 2003 meeting did not result in Wellington becoming a client of FCC. Therefore, on October 17, 2003, [d]efendant Peterson, accompanied James Crystal, CEO and chairman of FCC, travelled to Wellington and again solicited Wellington business. After the August and October meetings, Wellington did not renew its 26 year insurance relationship with the Balmer Agency but neither did it become a client of FCC. Defendants' solicitation of Wellington business set in motion a chain of events that directly caused the loss of the Wellington account by the Balmer Agency.

Following the collective resignation of individual [d]efendants and the establishment of FCC Philadelphia, B[arry] Balmer thereafter worked arduously to preserve the business of the Balmer Agency. Late 2005, Balmer was diagnosed with a terminal illness and decided in March of 2006 to sell the Balmer Agency. He died before the sale could be completed. On July 26, 2006, the sale of the Balmer Agency assets to Univest was completed. [Balmer] introduced insufficient evidence of any other potential arm's length purchase offer. The market price agreed to by Univest and the Balmer Agency was two times the agreed recurring net annual revenue, capped at 5 million dollars. The actual sales price, after due diligence, was 4.8 million dollars. There is no evidence of record that the Univest capped purchase price would have been higher because of the loss of revenue resulting from [d]efendants' conduct herein. The right to the causes of actions set forth in this litigation and any resultant damages were retained by the Balmer Agency.

FCC has agreed to indemnify the individual [d]efendants for any costs and damages they may owe to the Balmer Agency as a result of their actions in this litigation. It is clear to the trial

[c]ourt that FCC was the party [d]efendant in control of the entire defense in this litigation.

Trial Court Opinion, 12/10/14, at 2-8 (internal record citations and footnotes omitted).

On December 5, 2003, Balmer filed a multi-count complaint against Appellants. Counts 1 through 4 of the complaint pertained to breach of employment agreements by Hample, Courtney, Einstein, Reilly and Peterson. Specifically, Count 1 alleged improper "solicitation of Balmer clients," Count 2 alleged violation of a confidentiality provision, Count 3 alleged improper solicitation of Balmer employees, and Count 4 alleged improper inducement of Balmer clients to discontinue, cancel, terminate or decline renewals of insurance coverage. Count 5 of the complaint alleged that, as employees of Balmer, Hample, Courtney, Einstein, Reilly and Peterson breached the fiduciary duty owed to Balmer. Count 6 alleged that Einstein, Reilly, and Peterson, as officers and/or directors of Balmer, breached the fiduciary duty owed to Balmer. Counts 7 through 11 of the complaint pertained to all Appellants. Count 7 alleged tortious interference with contractual relations, Count 8 alleged unfair competition, Count 9 alleged misappropriation of proprietary, confidential and/or trade secret information, Count 10 alleged conspiracy, and Count 11 alleged unjust enrichment and constructive trust. The case eventually proceeded to a bench trial, following which the trial court entered a verdict in favor of Balmer and against Appellants on Counts 1 though 8 and Count 10 on July 1, 2013. The trial court, however, found in favor of Appellants and against Balmer on Counts 9 and 11. With respect to

Count 9, the trial court found that it was barred by the gist of the action doctrine because the relief requested was the same relief requested for the breach of contract claims. The trial court determined that Count 11 (unjust enrichment) did not merit relief given the existence of a valid, enforceable contract. The trial court awarded Balmer $2,391,569.00 in compensatory damages and $4,500,000.00 in punitive damages. Appellants timely filed a post-trial motion seeking judgment notwithstanding the verdict ("JNOV"). Appellants' post-trial motion was deemed denied by operation of law because the trial court failed to dispose of it within 120 days as required under Pa.R.C.P. No. 227.4(1)(b).[1] On November 12, 2013, Appellants filed a praecipe for entry of judgment. Thereafter, Appellants timely appealed to this Court.[2] Following Appellants' filing of a Pa.R.A.P. 1925(b) statement of errors complained of on appeal, the trial court issued a Pa.R.A.P. 1925(a) opinion.

_____

[1] Rule 227.4(1)(b) provides in relevant part:

> [T]he prothonotary shall, upon praecipe of a party enter judgment upon . . . the decision of a judge following a trial without jury if . . . one or more timely post-trial motions are filed and the court does not enter an order disposing of all motions within one hundred twenty days after the filing of the first motion. A judgment entered pursuant to this subparagraph shall be final as to all parties and all issues and shall not be subject to reconsideration[.]

Pa.R.C.P. No. 227.4(1)(b).

[2] We note that Balmer filed a cross appeal in this Court which it discontinued on February 18, 2015.

On appeal, Appellants raise the following questions which we have paraphrased somewhat for ease of disposition.

1. Was the trial court's award of $4.5 million in punitive damages legally erroneous because (a) the trial court failed to identify clear and convincing evidence to support its finding that outrageous or malicious conduct occurred, (b) the trial court failed to assess the subjective intent and financial means of each defendant against whom it awarded punitive damages, (c) the trial court failed to state the amount of punitive damages awarded on each count against each defendant, and/or (d) failed to dismiss the tort claims under the gist of the action doctrine?

2. Was the trial court's award of $2,391,569 in compensatory damages legally erroneous because it (a) was based on an expert report that should have been rejected, and (b) it included an award of both lost profits and diminution in value?

3. Did the trial court apply the incorrect legal standard to the non-solicitation and trade secret claims?

Appellants' Brief at 3-4.

Our standard of review of a trial court's denial of a motion for JNOV is as follows:

Whether, when reading the record in the light most favorable to the verdict winner and granting that party every favorable inference therefrom, there was sufficient competent evidence to sustain the verdict. Questions of credibility and conflicts in the evidence are for the trial court to resolve and the reviewing court should not reweigh the evidence. Absent an abuse of discretion, the trial court's determination will not be disturbed.

***Ferrer v. Trustees of Univ. of Pennsylvania***, 825 A.2d 591, 595 (Pa. 2002) (internal citations omitted). Furthermore, there are two bases upon which the court can grant JNOV:

One, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second, the court reviews the

evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

***Drake Mfg. Co. v. Polyflow, Inc.***, 109 A.3d 250, 258 (Pa. Super. 2015) (citation omitted).

We first address Appellants' challenge to the trial court's award of punitive damages in favor of Balmer. As mentioned, Appellants argue that the trial court abused its discretion in concluding that Appellants' conduct was outrageous and that punitive damages were barred by the gist of the action doctrine. We disagree.

As we recently explained in ***Lomas v. Kravitz***, 130 A.3d 107 (Pa. Super. 2015) (*en banc*):

> In reviewing challenges to punitive damage awards, we determine whether the trial court has committed any abuse of discretion or whether after a complete and exhaustive review of the record, the award shocks the court's sense of justice. Punitive damages are awarded to punish a person and/or entity for outrageous conduct. Conduct is considered outrageous where a defendant's action shows either an evil motive or reckless indifference to the rights of others. Reckless indifference to the interests of others, or as it is sometimes referred to, wanton misconduct, means that the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. The determination of whether a person's actions rise to outrageous conduct lies within the sound discretion of the fact-finder and will not be disturbed on review, provided that discretion has not been abused.

***Kravitz***, 130 A.3d at 128-29 (internal citation and quotation marks omitted); ***see also Reading Radio, Inc. v. Fink***, 833 A.2d 199, 214 (Pa. Super. 2003) (affirming an award of punitive damages based on appellants' outrageous conduct), ***appeal denied***, 847 A.2d 1287 (Pa. 2004).

In **Reading Radio**, appellant Reading Eagle offered appellant David Kline, who was the station manager of Reading Radio, Inc., t/d/b/a/ WAGO Radio (WAGO), a position in its A.M. radio station WEEU. Kline accepted the new position and tendered his resignation as the station manager of WAGO, but agreed to remain in WAGO's employ for thirty days. During the thirty-day period, Kline solicited Molly Fink and Isaac Ulrich, whom he supervised and who were described as the best performing sales representatives at WAGO, to work for appellant WEEU in identical sales positions that they held at WAGO in breach of non-compete covenants. Kline also cancelled a bluegrass music program on WAGO without notice to his employers and transferred a significant car dealership advertising account to appellant Reading Eagle.

Fink and Ulrich ultimately tendered their resignations directly to appellant Kline, who, although aware of the covenants-not-to-compete in Fink's and Ulrich's employment contracts, did not attempt to enforce them. The loss of the majority of its sales staff caused WAGO to lose a number of advertising clients and advertising promotions, and thus, the sales revenue and performance of WAGO faltered significantly. WAGO diminished in value by approximately $1.6 million.

WAGO thereafter initiated a civil action against appellants Kline, Fink, Ulrich, Reading Eagle, and WEEU for, *inter alia*, civil conspiracy, breach of contract, breach of pre-resignation and post-resignation common law and fiduciary duties, tortious interference with WAGO's contractual and business

relationships, seeking compensatory and punitive damages. Following a jury trial, the trial court returned a verdict in WAGO's favor and against appellants for $300,000.00 in compensatory damages and $805,000.00 in punitive damages.

On appeal, appellants challenged, among other things, the award of punitive damages, arguing that their conduct was not outrageous. We disagreed, and in so doing, concluded:

> The evidence presented to the jury in this case indicates that the conduct of Appellants was outrageous. Appellant WEEU and [a]ppellant Reading Eagle's agreement with [a]ppellant Kline to hire Fink and Ulrich in derogation of their contractual obligation to WAGO coupled with the complicity of appellant WEEU and [a]ppellant Reading Eagle in [a]ppellant Kline's breach of loyalty as a result of the formation of that agreement leaves this Court with little doubt that punitive damages were assessed properly in this case. It is of no moment that [a]ppellant WEEU and [a]ppellant Reading Eagle did not, as [a]ppellant argues, owe a duty of loyalty to WAGO. The evidence suggests that [a]ppellant WEEU and [a]ppellant ***Reading Eagle knew that [a]ppellant Kline was soliciting sales employees for them from WAGO in violation of WAGO's covenants-not-to-compete, because [a]ppellant Kline provided Ulrich with salary and employment information obtained from [a]ppellant WEEU and [a]ppellant Reading Eagle***.

***Reading Radio***, 833 A.2d at 214 (internal record citation omitted) (emphasis added).

Here, based on our review of the undisputed facts of record, we agree with the trial court's conclusion that Appellants' conduct warranted an award of punitive damages. Similar to some of the defendants in ***Reading Radio***, Appellants Hample, Courtney, Einstein, Reilly and Peterson were subject to a

- 11 -

restrictive covenant, *i.e.*, a non-solicitation agreement.[3]  As the trial court found, while Appellants Reilly and Peterson were employed by Balmer, they met with Craig Richards, an employment recruiter for FCC, a large insurance brokerage firm based in New York with approximately $66 million in annual revenue in 2003.  Thereafter, Appellants Reilly and Peterson met with FCC's president, Mark Freitas, to open an FCC office in Philadelphia.  Subsequently, while still in Balmer's employ, Appellant Reilly disclosed to Richards trade secret information about Balmer Agency clients and customers who could be moved to FCC Philadelphia along with names of Balmer employees that Reilly wished to join him at FCC Philadelphia.  Those employees made up all of Balmer's insurance sales/marketing staff, other than Barry Balmer himself.  Richards conveyed this information to FCC.

In the summer of 2003, Appellants Reilly, Peterson and the targeted Balmer employees met with Richards and FCC, after which they all received employment offers at a salary higher than what they earned at the Balmer Agency.  At the time of hiring, FCC knew of the existence of Appellants' employment agreements with the Balmer Agency and all Appellants were

---

[3] Although Appellants point out that **Reading Radio** involved non-compete covenants, whereas this case involves non-solicitation covenants, they do not explain how the distinction between the two types of restrictive employment covenants is a relevant consideration or compels a different outcome.

aware that they were subject to the same.[4]  All individuals arranged details of their employment with FCC while using Balmer Agency computers, office telephones, cell phones, fax machines and facilities and while on Balmer Agency's employment time.

As the trial court determined:

[Appellants] violated their fiduciary obligations to the Balmer Agency by helping FCC to establish FCC Philadelphia and its Balmer Agency customer base all while using Balmer Agency employment time, telephones, computers, fax machines and trade secret information.  [Appellants] Peterson and Reilly further breached their fiduciary duties to the Balmer Agency by recruiting or attempting to recruit [Appellants] Einstein, Courtney and Hample and other Balmer Agency employees Joe Valerio, David Krause, Jennifer Little and Pennock Yeatman.  All [Appellants] used Balmer Agency confidential trade secret information, including customer lists, for their own purposes and for the purposes of establishing FCC Philadelphia.

Trial Court Opinion, 12/10/14, at 10.

Prior to all individual Appellants resigning employment from the Balmer Agency within a day of each other, Appellant Reilly refused to return Appellant Einstein's personnel file to Gail Masayko and attempted to acquire Appellants Courtney's and Hample's personnel files, but was unsuccessful. Appellant Einstein compiled various client lists and trade secret information regarding the Balmer Agency's Wellington account including coverage and policy information and took this information with him when leaving the

_____

[4] The trial court observed that "[Appellant] FCC attempts to use Richards to shield itself from knowledge of, or complicity in, contractual breaches by individual [Appellants].  The [trial court] specifically finds that FCC and its representatives knew what . . . Richards knew prior to the establishment of FCC Philadelphia."  Trial Court Opinion, 12/10/14, at 11.

employment of the Balmer Agency. Other client list trade secret information regarding Balmer Agency clients had previously been disclosed to FCC by Appellants. Appellants took with them to FCC Philadelphia Balmer trade secret information and subsequently used that information when breaching their respective employment agreements. While Barry Balmer was on vacation, he received information that Appellants had resigned *en masse*. Shortly thereafter, Appellants began to solicit Balmer Agency clients and customers in violation of their employment agreements. At least twenty-four Balmer Agency customers or prospects were solicited by using trade secret information. All of these efforts were to benefit FCC.

Appellants contacted Balmer Agency clients and customers in an attempt to solicit and/or transfer those insurance businesses to FCC Philadelphia. The contacts, in violation of their respective employment agreements, were extensive. The most obvious and documented contractual violation engaged in by Appellants involved the Wellington account. That account had been a client of the Balmer Agency for over twenty-six years and was its largest and most lucrative client. Soon after resigning, Appellant Einstein, who had close contact with the Wellington account while at the Balmer Agency, contacted Wellington and set up a meeting with Wellington executives. Appellants Einstein, Reilly and Sanford F. Crystal, executive vice president of FCC who had FCC responsibility to gain Wellington as a client, all traveled to Boston, Massachusetts on August 12, 2003 to solicit the Wellington account for FCC. Appellants Einstein and Reilly prepared an

agenda for this meeting which included providing an explanation to Wellington how the Balmer Agency did not honor its succession commitment to them; bullet points to discuss the integrity/personal reputation of Barry Balmer and the Balmer Agency; and an introduction of FCC and the different services that can be provided by FCC. As the trial court found, an examination of the meeting agenda makes it clear that Appellants were there to solicit the Wellington business by promoting FCC and tarnishing Barry Balmer and the Balmer Agency. The last sentence of the agenda states: "We are committed to resolving issues for Wellington and are best able to by reason of market knowledge and knowledge of the client"

Appellants' contact with Wellington is a prime example of their breach of their employment agreements, use of Balmer trade secret information, the conspiratorial nature of the actions of all Appellants and the attempt to destroy Balmer Agency business relationships. The meeting with Wellington did not result in Wellington becoming a client of FCC. Therefore, Appellant Peterson, accompanied James Crystal, CEO and chairman of FCC, visited Wellington again to solicit Wellington business. After the August and October meetings, Wellington did not renew its 26-year insurance relationship with the Balmer Agency. Wellington also did not become a client of FCC. Appellants' solicitation of Wellington business set in motion a chain of events that directly caused the loss of the Wellington account by the Balmer Agency.

Furthermore, as the trial court found, when a company hires essentially all of the sales/marketing staff of one agency, the purpose in doing so is to induce the clients of that agency to move their business with that sales force. *Id.* at 12. FCC Philadelphia's first year business revenue of approximately $300,000.00 was received all from Balmer Agency clients. *Id.*

Based on the foregoing facts, we cannot conclude that the trial court abused its discretion in awarding punitive damages to Balmer based on its conclusion that Appellants' conduct was outrageous.[5] To reiterate, all individual Appellants had a non-solicitation covenant in their employment contracts, the existence of which was known to FCC. Appellant Reilly desired to move people and business from the Balmer Agency to FCC Philadelphia. Despite being aware of this, FCC hired all individual Appellants who eventually, with FCC's support, solicited clients, such as Wellington, from the Balmer Agency. As summarized by the trial court:

> All [Appellants] met on June 25, 2003 in New York City to discuss their resignations and start date at FCC Philadelphia. All

---

[5] The trial court bolstered its award of punitive damages by noting that Appellants committed discovery violations and failed to comply with its July 7, 2005 preliminary injunction order barring them from continuing business with poached Balmer Agency customers. The trial court, sitting as a fact finder, also may consider discovery violations in fashioning an award for punitive damages. *See Judge Tech. Servs., Inc. v. Clancy*, 813 A.2d 879, 889 (Pa. Super. 2002) (noting that "it was appropriate for a trial court to allow consideration of discovery violations in fashioning a remedy which included punitive damages").

[Appellants] knew of the existence of the employment agreements. The individual [Appellants] cleared out personal belongings at the Balmer Agency, attempted to delete information from Balmer Agency computers, immediately went to work at FCC Philadelphia and immediately began soliciting Balmer Agency clients using Balmer Agency trade secrets in violation of the employment agreements, all with the knowledge and assistance of FCC and for the purpose of benefitting FCC Philadelphia. This conduct was deliberate and reckless with respect to the violation of their contractual and fiduciary obligations at the Balmer Agency and the resultant damage their actions would create. The [trial court] finds these actions to be with unjustifiable malice with the intent to establish FCC Philadelphia at the direct and crippling expense of the Balmer Agency. As a result of this conduct, the Balmer Agency suffered damage. All revenues in the first year of FCC Philadelphia w[ere] received from Balmer clients. This intended malice is reflected in [Appellant] Reilly's letter to Craig Richards stating that 50% of FCC Philadelphia revenues for 2004, 2005 and 2006 will come from solicited Balmer Agency clients. He states: "In short, why compete when we do not have to do so . . . ."[6]

*Id.* at 12. Accordingly, we find no error in the award of punitive damages based upon the trial court's finding of outrageous conduct by the Appellants.

Before addressing Appellants' arguments that the trial court erred by failing to assess the subjective intent and financial means of each defendant against whom it awarded punitive damages and to state the amount of punitive damages awarded on each count against each defendant, we need to determine whether these issue were properly preserved for this Court's review. Appellants' Rule 1925(b) statement provides in relevant part:

[t]he trial court erred in awarding any, or excessive, punitive damages. There was a complete lack of evidence of any outrageous or malicious conduct that would warrant punitive damages under Pennsylvania law. Even if the trial court's award

---

[6] The trial court noted that Appellant Reilly overestimated FCC Philadelphia's non-Balmer client revenue producing capability when he informed FCC that 50% of its revenue would come from Balmer clients. Instead, it actually was 100%. *See* Trial Court Opinion, 12/10/14, at 12.

of punitive damages could be supported (which it cannot), it was excessive, both in absolute terms and as compared to the actual damages, in this commercial case.

*See* Appellants' Rule 1925(b) Statement. Issues not included in a Rule 1925(b) statement or fairly suggested by the issue(s) stated are deemed waived. Pa.R.A.P. 1925(b)(4)(v) and (vii). Our Supreme Court will not countenance anything less than strict application of waiver pursuant to Rule 1925(b). *Greater Erie Indus. Development Corp. v. Presque Isle Downs, Inc.*, 88 A.3d 222, 224 (Pa. Super. 2014) (*en banc*). Failure to comply with the requirements of Rule 1925(b) will result in automatic waiver of the issues raised. Upon review of the Appellants' Rule 1925(b) statement, we do not find that the issues as to whether the trial court properly considered the subjective intent and financial means of each defendant or whether there was error not to determine punitive damages on an individual basis, are stated or fairly comprised within the issue stated in Appellants' 1925(b) statement. Accordingly, we are unable to address these issues, as they have not been preserved for appeal.[7]

To the extent Appellants argue that the trial court erred in accepting the testimony of Balmer's expert because it lacked a proper foundation, we find the argument likewise is waived. Appellants failed to object to the testimony of Balmer's expert on this basis at trial. *See* Pa.R.A.P. 302(a)

---

[7] Nonetheless, we note that FCC agreed at trial to indemnify the co-defendants. *See e.g.*, N.T. Trial, 4/6/09, at 57-63; N.T. Trial, 4/7/09, at 9-12.

(issues not raised in lower court are raised and cannot be raised for first time on appeal). Although Appellants' assert that the lack of foundation was raised on four separate occasions at trial, *see* Appellants' Brief at 44, we cannot find support for this statement upon review of the record. Pa.R.A.P. 2117(c) and 2119(e) require that an appellant's statement of the case and argument, respectively, indicate specifically where in the record an issue was timely and properly raised so as to preserve the question for appeal. Here, Appellants cite *en masse* to this Court approximately 84 pages of the record pertaining to closing arguments and another 204 pages pertaining to argument on post-trial motions and post-trial briefs in which they claim this issue was preserved for appeal. Apart from the fact that objections as to proper foundation should be timely lodged well before the filing of post-trial motions, this Court repeatedly has stated that it will not scour the record in order to find support for statements made by litigants in their briefs. **See Commonwealth v. Kearney**, 92 A.3d 51, 66-67 (Pa. Super. 2014) (noting it is not the responsibility of this Court to scour the record to find evidence to support an argument). Nonetheless, we have attempted to review this volume of material to attempt to identify where this issue was preserved during trial and have not been able to do so. The issue is waived.[8]

_____

[8] Even if Appellants' credibility challenge to Balmer's expert had been preserved, it is without merit because we may not disturb the trial court's weight and credibility determinations, specifically here as they relate to gross margin and cost of goods sold as delineated in the Strategic Plan. **See**
*(Footnote Continued Next Page)*

Appellants next argue that the trial court abused its discretion in awarding punitive damages because the gist of the action doctrine bars Balmer's tort claims. Differently stated, Appellants assert that the trial court should have dismissed the tort claims under the gist of the action doctrine because the breach of employment agreements is the gist of the current action.

The gist of the action doctrine prohibits a plaintiff from re-casting ordinary breach of contract claims into tort claims. *Empire Trucking Co., Inc. v. Reading Anthracite Coal Co.*, 71 A3.d 923, 931 n.2 (Pa. Super. 2013) (citation omitted). As we explained in *Reardon v. Allegheny College*, 926 A.2d 477 (Pa. Super. 2007), *appeal denied*, 947 A.2d 738 (Pa. 2008):

> The gist of the action doctrine acts to foreclose tort claims: 1) arising solely from the contractual relationship between the parties; 2) when the alleged duties breached were grounded in the contract itself; 3) where any liability stems from the contract; [or] 4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim.[9] The critical conceptual distinction between a breach of contract claim and a tort claim is that the former arises out of breaches of duties imposed by mutual consensus agreements between particular individuals, while the latter arises out of **breaches of duties imposed by law as a matter of social policy**.

*(Footnote Continued)* ————————————

*Turney Media Fuel v. Toll Bros.*, 725 A.2d 836, 841 (Pa. Super. 1999) ("Assessments of credibility and conflicts in evidence are for the trial court to resolve; this Court is not permitted to reexamine the weight and credibility determinations or substitute our judgments for those of the factfinder.").

[9] In *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 67 (Pa. 2014), our Supreme Court noted that the four-part "test" implicates "four situations" in which the gist of the action doctrine precluded a tort claim.

*Reardon*, 926 A.2d at 486-87 (internal citation and quotations omitted)

(emphasis added); *accord Hart v. Arnold*, 884 A.2d 316, 339-40 (Pa.

Super. 2005), *appeal denied*, 897 A.2d 458 (Pa. 2006).

> Our Supreme Court explained recently:
>
> If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—*i.e.*, a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort. *See Ash v. Cont'l Ins. Co.*, 5932 A.2d 877, 885 ([Pa.] 2007) (holding that action against insurer for bad faith conduct pursuant to 42 Pa.C.S.A. § 8371 is for breach of a duty "imposed by law as a matter of social policy, rather than one imposed by mutual consensus"; thus, action is in tort); *see also W. Page Keeton, Prosser and Keeton on Torts* 656 (5th ed. 1984) (reviewing extant case law, and noting the division therein between actions in tort and contract based on the nature of the obligation involved, observing that "[t]ort obligations are in general obligations that are imposed by law on policy considerations to avoid some kind of loss to others . . . [which are] independent of promises made and therefore apart from any manifested intention of parties to a contract, or other bargaining transaction."). Although this duty-based demarcation was first recognized by our Court over a century and a half ago, it remains sound, as evidenced by the fact that it is currently employed by the high Courts of the majority of our sister jurisdictions to differentiate between tort and contract actions. We, therefore, reaffirm its applicability as the touchstone standard for ascertaining the true gist or gravamen of a claim pled by a plaintiff in a civil complaint.
>
> . . . .
>
> [T]he mere existence of a contract between two parties does not, *ipso facto,* classify a claim by a contracting party for injury or loss suffered as the result of actions of the other party in performing the contract as one for breach of contract.

*Bruno*, 106 A.3d at 68–69 (some citations omitted, others modified;

footnotes omitted).

Here, Appellants appear to rely only on the fourth test from **Reardon** in arguing that the gist of the action doctrine bars Balmer's tort claims. Specifically, Appellants argue that "all of Balmer's purported tort claims were either duplicative of, or dependent on, Balmer's claim that Hample, Courtney, Einstein, Reilly and Peterson breached their employment contracts." Appellants' Brief at 30. We disagree.

Balmer's tort claims are separate and distinct from the claims for breach of the employment agreements containing the non-solicitation provision. As stated earlier, Balmer's tort claims, *inter alia*, were set forth in Counts 5, 6, 7, 8, and 10 of the complaint. Count 5 pertained only to Appellants Hample, Courtney, Einstein, Reilly and Peterson and involved an allegation that they breached a fiduciary duty of loyalty owed to the Balmer Agency while they were employed at the Balmer Agency. Count 6 alleged that Appellants Einstein, Reilly and Peterson, as officers and directors, breached their fiduciary duty of loyalty to the Balmer Agency. Specifically, Count 6 alleged:

92. [Appellants] Reilly, Peterson and Einstein breached their fiduciary duty by, among many other actions and omissions,

A. inducing Hample and Courtney to resign and attempting to induce other Balmer employees, including but not limited to the Marketing Manager, to resign; and join them in working for [Appellant FCC] in direct competition with [Balmer] and to the financial detriment of [Balmer];

B. Conspiring to leave [Balmer] as a group in such a way as to attempt to cripple and/or destroy

Balmer without informing the President and Chief Executive Officer;

C. Using Company time, for which they were then being paid and Company resources to plan a course of action to further their own personal and collective financial goals at the expense of [Balmer];

D. Conspiring to leave Balmer and unlawfully use information the Appellants obtained while at Balmer to directly compete with [Balmer] to [Balmer's] detriment and for [Appellants'] personal financial gain;

E. Failing to notify [Balmer] that they intended to leave and to unlawfully use information the [Appellants] obtained while at Balmer to directly compete with [Balmer] to [Balmer]'s detriment, and for [Appellants'] personal financial gain;

F. Conspiring to leave [Balmer] in such a way to attempt to financially cripple and/or destroy the financial viability of [Balmer's] business for the furtherance of [Appellants'] personal financial gain;

G. Using Company paid time and resources to conspire to, and arrange, a plan to leave Balmer and join a competitor in such a way as to attempt to cripple and/or destroy [Balmer] for the furtherance of [Appellants'] personal financial gain;

H. Failing to notify [Balmer] that they were using Company paid time and Company resources to communicate with outside third parties for the purpose of obtaining employment elsewhere to compete with [Balmer] to its financial detriment and [Appellants'] personal financial gain; and

I. Failure to notify Balmer that they intended to leave the Company in such a manner as to attempt to financially cripple and/or destroy the viability of [Balmer] by, *inter alia*, (1) depriving [Balmer] immediately of its officers (2) depriving [Balmer] immediately of members of its Executive Committee; (3) creating the impression within the

- 23 -

client community that [Balmer] had no ability to effectively function in the commercial insurance field; (4) creating the impression with the employees of [Balmer] that [Balmer] had no ability to function within the commercial insurance field.

Balmer's Complaint, 12/3/05 at ¶ 92. Counts 7 (tortious interference), 8 (unfair competition) and 10 (conspiracy) were asserted as to all Appellants, including FCC.[10] Count 7 in particular alleged:

94. All of the individual [Appellants] had knowledge that the other individual [Appellants] had an Employment Agreement with [Balmer] (with provisions, including the non-solicitation of Balmer clients, non-solicitation of Balmer employees, non-inducement and the confidentiality/non-use agreements therein).

95. Each of the individual [Appellants] tortiously interfered with the contractual relationship between [Balmer] and the other individual [Appellants] by, *inter alia*, inducing them to reveal confidential, proprietary and/or trade secret information, solicit Balmer customers, conspiring with each other to do the above, induce Balmer customers to decline renewal of insurance policies, and/or solicit other Balmer employees.

96. In addition, [Appellant FCC] has tortiously interfered with the contractual relationship between [Balmer] and the other individual [Appellants] by, *inter alia*, inducing them to reveal confidential, proprietary and/or trade secret information, conspiring with each other to do the above, solicit Balmer customers, to encourage Balmer customers to decline renewal, and/or solicit other Balmer employees, despite [Appellant] FCC's] knowledge that each of the individual [Appellants] was party to an Employment Agreement (with post-employment restrictive covenants) with [Balmer].

*Id.* at ¶¶ 94-96. Count 8 incorporated all averments alleged in the complaint regarding the Appellants' conduct and asserted a claim for unfair

---

[10] The gist of the action doctrine does not apply to tort claims asserted against FCC because it did not have a contractual relationship with the Balmer Agency.

competition. Count 10 of the complaint alleged a conspiracy among all Appellants to leave Balmer *en masse* and to use confidential and proprietary client and/or trade secret information to compete with Balmer. Appellants do not challenge their liability for the foregoing tort claims. Instead, they argue only that the tort claims were duplicative of or dependent on the contract claims, *i.e.*, breach of the non-solicitation provision.

As Appellants acknowledge (and Balmer agrees), the contract claims asserted by Balmer did not arise **until after** Appellants had terminated their employment with the Balmer Agency. **See** Appellants' Brief at 54. Indeed, it is undisputed that the employment agreements containing the non-solicitation provision went into effect only **after** the individual Appellants left their employment. Thus, Balmer's tort claims directed at Appellants while employed at Balmer implicate breach of common law duties. Here, as Balmer's complaint reveals, the tort claims arose out of legal obligations separate and distinct from the employment contracts because they were based on each individual Appellants' conduct **while they were employed** with the Balmer Agency. Accordingly, the trial court did not err in concluding that the gist of the action doctrine did not apply to bar Balmer's tort claims. **See Knight v. Springfield Hyundai**, 81 A.3d 940, 951 (Pa. Super. 2013) (declining to apply the gist of the action doctrine in part because the "alleged representations by [a]ppellees occurred prior [to] the signing of any contract"); **Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.**, 247 F.3d 79, 104 (3rd Cir. Pa. 2001) (concluding that the breach of

fiduciary duty claim was not barred by the gist of the action doctrine),[11]

***cert. denied***, 534 U.S. 1162, 122 S. Ct. 1173 (2002); ***see also generally***

***Reading Radio***, 833 A.2d at 211 (finding breach of fiduciary duty of loyalty,

intentional interference with contractual relations, civil conspiracy and

outrageous conduct supporting punitive damages despite defendants'

employment agreement containing restrictive covenants)*.*

Appellants next argue that the punitive damages award of $4.5 million

exceeds the single digit ratio and, as a result, is unconstitutional. We

disagree.

In ***State Farm Mutual Automobile Insurance Company v.***

***Campbell***, 538 U.S. 408 (2003), the United States Supreme Court

explained:

> We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In [***Pacific Mutual Life Insurance Co v.***] ***Haslip***,[499 U.S. 1 (1991)], in upholding a punitive damages award, we concluded that an award of more than four times the

---

[11] In ***Bohler-Uddeholm***, a majority partner in a joint venture was accused of breaching fiduciary duties to the minority partner and appropriating the minority partner's trade secrets. The Third Circuit Court of Appeals held that the breach of fiduciary duty claim was not barred by the gist of the action doctrine because the fiduciary duties flowing from majority partners to minority partners are separate and distinct from the contractual duties contained in the joint venture agreement. ***Bohler-Uddeholm***, 247 F.3d at 104-105. The court further held that the misappropriation claim was not barred by the gist of the action doctrine so long as the trade secrets were not the subject of a contract between the parties. ***Id.*** at 106.

amount of compensatory damages might be close to the line of constitutional impropriety. 499 U.S. at 23–24[]. We cited that 4–to–1 ratio again in [**BMW of North America, Inc. v.**] **Gore**, 517 U.S. [559 (1996)]. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. **Id.** at 581, and n. 33[]. While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, **id.**, at 582 [], or, in this case, of 145 to 1.

**State Farm**, 538 U.S. at 408.

Here, it is undisputed that the compensatory damages award was for $2,391,569.00 and the punitive damages award for $4,500,000.00, representing a ratio of punitive to compensatory damages of 1.88 to 1. Based on and consistent with **State Farm**, at 1.88 to 1, there is nothing here improper about the ratio between punitive and compensatory damages.

Appellants next argue only as a general principle of law that the trial court erred in awarding as compensatory damages $2,191,569 for lost profits and $200,000 in the diminution in value of Balmer's business because Pennsylvania law precludes an award of both diminution in value and lost profits. Although Appellants do not expressly state so, we understand this argument to be that a plaintiff may not recover both lost profits and diminution in value because this would permit recovery twice for the same damages. Although it is true that an injured party cannot recover twice for the same injury, **see D'Adamo v. Erie Insurance Exchange**, 26 A.3d 483 (Pa. Super. 2010), Appellants cite no authority, and we are unable to find any, that would establish, as a blanket rule, that lost profits and diminution

in value may never be recovered together because these damages always are duplicative of each other. To the contrary, where a plaintiff is able to demonstrate damages for loss of profits and loss of equity value that are not duplicative of each other due to the tortious conduct of another party, both types of damages may be recovered as compensatory damages. *See Miller Oral Surgery, Inc. v. Dinello*, 611 A.2d 232, 237 (Pa. Super. 1992) (both loss of profits due to diversion of patients as a present loss and resulting future and recurring loss of business were compensable damages). Appellants here do not develop an argument based upon an analysis of the evidence presented at trial that lost profits or diminution in value, as a matter of law and not as a mere difference of opinion between experts, were awarded for the same harm or otherwise amount to double recovery by Balmer. Balmer, on the other hand, describes its damages as comprising two parts; the first as lost revenue over the three-year period prior to the business being sold because of clients leaving Balmer, and second, a diminished sale price of the business as a result of the business having fewer clients. The first component of Balmer's damages for lost profits relate to its present loss of business, while the second component of Balmer's damages relate to the diminished value of the business on a going forward basis as a result of having fewer clients. We do not view these claims as being duplicative of each other and therefore, find no merit to the issue raised by Appellants.

Finally, insofar as Appellants argue that the trial court applied the wrong legal standard to the non-solicitation claims, we again are constrained to find that this argument too is waived because Appellants failed to raise it in their Rule 1925(b) statement. *See Madrid v. Alpine Mountain Corp.*, 24 A.3d 380, 382 (Pa. Super. 2011) (citation omitted); *see also* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the [concise s]tatement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").

Judgment affirmed. Application to strike footnote denied.[12]

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/9/2016

_____

[12] We deny Balmer's Application to Strike Footnote of Appellants' Reply Brief as we did not rely on the disputed statements in rendering this decision. The certified record was available for our review.