J-A26011-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| DOROTHY YOUNKIN, AS EXECUTRIX OF THE ESTATE OF EDWARD BEENER | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| GEORGE BEENER, DARLEEN BEENER,TIMOTHY SHOW AND RITA SHOW, INDIVIDUALLY AND TRADING AS BTC DEVELOPMENTS | : : : : : : : : | No. 1802 WDA 2018 |
| APPEAL OF: GEORGE BEENER | : | |

Appeal from the Order Entered November 30, 2018
In the Court of Common Pleas of Somerset County Civil Division at
No(s):  Case No. 363 Civil 2012

BEFORE:  SHOGAN, J., LAZARUS, J., and OLSON, J.

MEMORANDUM BY SHOGAN, J.:                    **FILED FEBRUARY 27, 2020**

Appellant, George Beener, appeals from the order[1] entering a verdict against him and in favor of Dorothy Younkin, ("Younkin"), Executrix of the Estate of Edward Beener ("Estate"), in the amount of $104,676.00.  We affirm.

_____

[1] Following a nonjury trial, the trial court entered its decision on September 19, 2018.  Appellant filed a timely post-trial motion, which was denied on November 30, 2018.  Appellant filed a timely appeal on December 20, 2018. **See Chalkey v. Roush**, 805 A.2d 491, 496 (Pa. 2002) (where a trial has taken place and timely post-trial motions have been filed pursuant to Rule 227.1, the appeal period does not begin to run until the trial court has issued a decision on the post-trial motions.)  In his notice of appeal, Appellant purports to appeal from the order entered November 30, 2018.  It appears that Appellant sought to appeal the November 30, 2018 denial of the post-

The trial court summarized the factual and procedural history of this case as follows:

This case began with the filing of a Praecipe for Writ of Summons on May 11, 2012[,] and a Complaint on October 29, 2012, asserting claims for conversion, breach of a bailment agreement, replevin, and unjust enrichment. Dorothy Younkin, in her capacity as administrator of the Estate of Edward Beener (hereinafter [("Younkin")]), alleged that Appellant, Darlene Beener, Timothy Show, and Rita Show, in their individual capacity and trading as BTC Developments (hereinafter "Defendants"),[2] converted and disposed of certain pieces of heavy equipment previously used in mining operations, including a 1952 Marion Model 7400 Dragline (hereinafter ["the] Dragline"), which were the rightful property of the Estate of Edward Beener (hereinafter the "Estate").

After [Younkin] filed an Amended Complaint following Preliminary Objections, Defendants filed their Answer on April 30, 2013, arguing, *inter alia*, that the Dragline had been sitting disused on BTC Development property since the early nineties and had been abandoned by the Estate by the time it was sold.

_____

trial motion despite the fact that an appeal does not properly lie from an order denying a post-trial motion. "An appeal to this Court can only lie from judgments entered subsequent to the trial court's disposition of post-verdict motions, not from the order denying post-trial motions." **Fanning v. Davne**, 795 A.2d 388, 391 (Pa. Super. 2002).

We note, however, that also on December 20, 2018, Appellant filed a praecipe for entry of judgment. Although there is no indication in the record that judgment was subsequently entered, we deem done that which ought to have been done. **Johnston the Florist, Inc. v. TEDCO Constr. Corp.**, 657 A.2d 511, 514-515 (Pa. Super. 1995) (*en banc*). Further, we may review an appeal in the absence of a properly entered judgment, where as here, "the order from which a party appeals was clearly intended to be a final pronouncement on the matters discussed ...." **Id.** As such, we will consider this appeal as being properly before our Court.

2 Younkin and her husband were also part owners of BTC Developments. N.T., 9/11/18, at 33.

Defendants admitted that the Dragline had been scrapped, but back in 2005,[3] nearly seven years before [Younkin] filed suit, and Defendants asserted that the claims were therefore barred under the statute of limitations.

Thereafter, the case appears to have stalled until late 2015, when this [c]ourt called the case for an inactive hearing. [Younkin] indicated that she still wished to pursue the Estate's claims, and the case was continued. After several Case Management Conferences in 2016 and not much activity besides, we scheduled a nonjury trial for the September 2017 term of court. Defendants filed a Petition to Continue Non Jury Trial on August 7, 2017, explaining that Appellant and his son, Kevin Beener, both indispensable witnesses in the case, had pled guilty in a separate criminal case in the Western District of Pennsylvania. Both men had received probation, house incarceration, and house detention, lasting until February 2018 for Appellant and August 2018 for Kevin Beener. Defendants therefore requested that the nonjury trial be continued to the September 2018 term. We granted that request.

On September 11, 2018 we conducted a nonjury trial. We subsequently issued a verdict in favor of [Younkin] against Appellant, individually, in the amount of $104,676.00, representing the sale proceeds of the scrapped Dragline. We ruled in favor of the four other Defendants, individually and trading as BTC Developments, against [Younkin]. This appeal followed.

Trial Court Opinion, 3/29/19, at 1-2. Appellant and the trial court complied

with Pa.R.A.P. 1925.

Appellant presents the following issues for our review:

1.    Did [Younkin] prove a cause of action for Conversion against [Appellant]?

2.    Did [Younkin] prove a cause of action for Unjust Enrichment against [Appellant]?

---

[3] Although subsequent evidence established that the Dragline was scrapped in 2008, Defendants' April 30, 2013 answer states that it was disposed of in 2005. Answer, 4/30/13, at ¶ 19.

3.     Did [Younkin] plead a cause of action for piercing the corporate veil of Tri-Star Mining, Inc.[,] seeking to hold [Appellant] liable for the sale of the Dragline for scrap?

4.     Did [Younkin] prove a cause of action for piercing the corporate veil of Tri-Star Mining, Inc. for holding [Appellant] liable for the sale of the Dragline for scrap?

5.     Did [Younkin] prove a cause of action for Breach of a Bailment Agreement against [Appellant]?

6.     Did [Younkin] prove a cause of action for Replevin against [Appellant]?

7.     Were the causes of action for Conversion and Unjust Enrichment barred by the Statute of Limitations and Laches?

8.     Had [Younkin] abandoned the Dragline?

Appellant's Brief at 4.[4]

Our standard for reviewing nonjury verdicts is as follows:

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, where the issue concerns a question of law, our scope of review is plenary.

***Ferraro v. Temple University***, 185 A.3d 396, 401 (Pa. Super. 2018)

(citation omitted).

_____

[4] We reordered Appellant's Statement of Questions involved for ease of disposition.

- 4 -

Appellant's first four issues are interrelated, and as such, we shall address them together. In his first claim, Appellant argues that Younkin failed to prove that Appellant was liable for conversion. Appellant's Brief at 9. Appellant asserts that:

[i]n 2008, [Appellant], in his capacity as the managing director, officer and shareholder of Tri-Star Mining, Inc., made the decision to get rid of the Dragline from its permitted mining site due to pressure from the Federal Government and the State of Maryland as its presence violated Federal and State laws. It became inoperable and immovable in March of 1993 and remained in the same place until well into 2008, some 15 years! It created a risk to the mining permit. The disposition and sale was negotiated by Kevin Beener, a Tri-Star employee, who signed the sale agreement on August 8, 2008 for $165,000 to Kantner Iron & Steel, Inc. which bought it for scrap and which proceeded to cut it apart. . . . Neither [Appellant nor Kevin Beener] acted for himself but for Tri-Star which received the $165,000, deposited in Tri-Start's bank account and used the funds to pay some of Tri-Star's bills. [Appellant] did not receive any of that money. If any conversion took place, then it was by Tri-Star, not [Appellant].

*Id.* at 9.

In his second issue, Appellant similarly argues that the trial court erred in finding that he was unjustly enriched by the sale of the Dragline. Appellant's Brief at 11. Appellant maintains that the sale of the Dragline was by a written agreement made by Tri-Star, and the proceeds from the sale went into Tri-Star's bank account, where it was used to pay some of its bills. *Id.* Appellant maintains that no evidence was presented to show that the $165,000 or any part thereof went to Appellant from either Kantner or Tri-Star or that any part went to pay the personal bills of Appellant. *Id.* Instead, Appellant posits, the

benefit went to Tri-Star, which then directly benefited the six shareholders of Tri-Star, including Younkin and her husband.[5]  *Id.*

Related to his first and second claims are Appellant's third and fourth issues that Younkin failed to plead or prove a "cause of action" for piercing the corporate veil of Tri-Star to hold Appellant liable for the sale of the Dragline. Appellant's Brief at 11-12.  Appellant asserts that Younkin's amended complaint did not include a cause of action for "Piercing the Corporate Veil." *Id.* at 11.  Accordingly, Appellant maintains that Younkin cannot now "save her case by raising a cause of action that she never even pled."  *Id.* at 12. Moreover, Appellant contends that Younkin failed to provide any evidence "that the $165,000 or any part thereof went to [Appellant] from either Kantner or Tri-Star or that any part went to pay the personal bills of [Appellant].  The benefit went to Tri-Star which then indirectly benefited the six shareholders of Tri-Star including Younkin and her husband." *Id.* at 11.  Thus, Appellant asserts, the trial court found Appellant liable for conversion and unjust enrichment by piercing the corporate veil and erred by doing so.  *Id.*

Our Court has set forth the elements of a cause of action for conversion as follows:

> Conversion is a tort by which the defendant deprives the plaintiff of his right to a chattel or interferes with the plaintiff's use or possession of a chattel without the plaintiff's consent and

---

[5] The same six owners of BTC Developments were the same six shareholders of Tri-Star Mining, Inc., including Younkin and her husband.  N.T., 9/11/18, at 44-45.

without lawful justification. A plaintiff has a cause of action in conversion if he or she had actual or constructive possession of a chattel at the time of the alleged conversion. Money may be the subject of conversion.

***Pittsburgh Const. Co. v. Griffith***, 834 A.2d 572, 581 (Pa. Super. 2003).

In the case *sub judice*, it is undisputed that in 2008, Younkin was the Executrix of the Estate of Edward Beener, and that she filed the current lawsuit in an effort to collect missing equipment owned by the Estate. N.T., 9/11/18, at 28, 30-31. As Executrix, she had the authority to maintain and direct the assets of the estate. ***In re Estate of Westin***, 874 A.2d 139, 144 (Pa. Super. 2005) ("one aspect of the fiduciary duty of the executor is to take possession of, maintain and administer all the real and personal estate of the decedent ....") (quoting 20 Pa.C.S. § 3311) (internal quotation marks omitted). Appellant also acknowledged that the Dragline belonged to the Estate. N.T., 9/11/18, at 110. As such, Younkin had constructive possession of the Dragline at the time of the alleged conversion. ***Pittsburgh Const. Co.***, 834 A.2d at 581.

Furthermore, the evidence of record supports the conclusion that Appellant and Tri-Star interfered with the Estate's possession of the Dragline without obtaining the Estate's consent,[6] and without lawful justification. Although Appellant argues that the Dragline had to be removed from the

---

[6] Appellant conceded that he did not contact anyone from the Estate prior to having the Dragline scrapped regarding his belief that it had been abandoned. N.T., 9/11/18, at 115.

property in order to comply with federal and state law so as not to interfere with the mining permit, there is no evidence that Appellant contacted Younkin as the Executrix of the Estate to have her take action to remove the Dragline from the property. Moreover, any money generated by the scrapping or sale of the Dragline would have properly become an asset of the Estate. Those proceeds were not paid to the Estate. Accordingly, we agree with the trial court's conclusion that the elements of conversion have been established.

With regard to a cause of action for unjust enrichment, this Court has explained: Unjust enrichment is an equitable remedy, defined as "the retention of a benefit conferred by another, without offering compensation, in circumstances where compensation is reasonably expected, and for which the beneficiary must make restitution." ***Roethlein v. Portnoff Law Assocs., Ltd.***, 81 A.3d 816, 825 n.8 (Pa. 2013). "A cause of action for unjust enrichment arises only when a transaction is not subject to a written or express contract." ***Northeast Fence & Iron Works, Inc. v. Murphy Quigley Co., Inc.***, 933 A.2d 664, 669 (Pa. Super. 2007). A claim for unjust enrichment arises from a quasi-contract. "A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another." ***Stoeckinger v. Presidential Financial Corp. of Delaware Valley***, 948 A.2d 828, 833 (Pa. Super. 2008).

> The elements of unjust enrichment are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant,

and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. Whether the doctrine applies depends on the unique factual circumstances of each case. In determining if the doctrine applies, we focus not on the intention of the parties, but rather on whether the defendant has been unjustly enriched.

Moreover, the most significant element of the doctrine is whether the enrichment of the defendant is unjust. The doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff.

*Id.*

In concluding that Tri-Star and Appellant were unjustly enriched, the trial court provided the following analysis:

Appellant testified that back sometime in the early 1990s, when the Dragline was first moved to BTC Development properties, that there was an agreement that it would be scrapped. Tr. 77:18-22. At this time, Appellant was still serving as the administrator for the Estate. Pl.'s Mot. in Limine ¶¶ 5, 6. We do not find Appellant's testimony credible as to the agreement to scrap the Dragline, but the fact remains that the Dragline was moved onto BTC Development properties with the apparent consent of the Estate. Thus we can only assume that the Estate, administered by Appellant at the time, made some kind of agreement with Appellant which resulted in the Dragline being used and stored in the custody of Appellant. Appellant appreciated and benefitted from this custody by allowing a third party, Kantner Iron & Steel, to access the Dragline, disassemble it, and sell it for scrap. Appellant then, through his business Tri-Star Mining, Inc., retained all of the benefit of payment for the scrap metal and made no payment of value to the Estate. These facts demonstrate that Appellant was unjustly enriched by selling the Dragline for scrap.

Trial Court Opinion, 3/29/19, at 5 (internal citations omitted).

We agree. Again, we note that neither Appellant nor Tri-Star owned the

Dragline; it was owned by the Estate. Therefore, Appellant's claim regarding

- 9 -

a written contract between Tri-Star and Kantner is irrelevant to this discussion. There was no evidence of a written or express contract between Tri-Star and the Estate regarding the Dragline and its scrapping by Kantner. Furthermore, Appellant, through Tri-Star, obtained and retained the benefit of the proceeds of the sale from scrapping the Dragline, although Tri-Star had no basis on which to obtain or retain that benefit. The proceeds from the sale of the Dragline belonged to the Estate. Tri-Star made no payment to the Estate for that value. Thus, Tri-Star was unjustly enriched as a result of selling the Dragline for scrap and then keeping those assets.

Appellant's argument that if any conversion or unjust enrichment occurred, it was committed by Tri-Star and not him personally, is also without merit. We first note there is no cause of action for "piercing the corporate veil." "A request to pierce the corporate veil is not an independent cause of action, but rather is a means of imposing liability established in an underlying cause of action, such as tort or breach of contract, against another." ***Commonwealth by Shapiro v. Golden Gate National Senior Care LLC***, 194 A.3d 1010, 1035 (Pa. 2018). Thus, Appellant's argument that Younkin is precluded from asserting a "piercing the corporate veil" claim now because she failed to raise it as a cause of action in her Amended Complaint is without merit.

In addressing Appellant's argument that the corporate veil should not have been pierced to hold him personally liable, we consider the following

principles. Preliminarily, we note: "Pennsylvania carries a strong presumption against piercing the corporate veil. The corporate entity should be upheld unless specific, unusual circumstances call for an exception." **Mark Hershey Farms, Inc. v. Robinson**, 171 A.3d 810, 816 (Pa. Super. 2017) (citation omitted). Our Supreme Court recently stated: "The corporate veil will be pierced and the corporate form disregarded whenever justice or public policy demand, such as when the corporate form has been used to defeat public convenience, justify wrong, protect fraud, or defend crime." **Commonwealth by Shapiro**, 194 A.3d at 1035 (internal citation omitted).

> In deciding whether to pierce the corporate veil, courts are basically concerned with determining if equity requires that the shareholders' traditional insulation from personal liability be disregarded and with ascertaining if the corporate form is a sham, constituting a facade for the operations of the dominant shareholder. Thus, we inquire ... whether corporate formalities have been observed and corporate records kept, whether officers and directors other than the dominant shareholder himself actually function, and whether the dominant shareholder has used the assets of the corporation as if they were his own.

**Mark Hershey Farms**, 171 A.3d at 816 (emphasis omitted) (citations omitted).

This Court's *en banc* panel in **Lomas v. Kravitz**, 130 A.3d 107 (Pa. Super. 2015), addressed the factors a court should consider when deciding whether to pierce the corporate veil: "We consider the following factors when determining whether to pierce the corporate veil: (1) undercapitalization; (2) failure to adhere to corporate formalities; (3) substantial intermingling of corporate and personal affairs; and (4) use of the corporate form to perpetrate

a fraud." ***Lomas***, 130 A.3d at 126 (citing ***Lumax Industries, Inc. v. Aultman***, 669 A.2d 893, 895 (Pa. 1995)).

During the nonjury trial, the parties stipulated to and made part of the record findings from the January 29, 2015 trial court opinion in another legal matter involving Appellant, ***Younkin v. Beener, et al***, 353 Civil 1999 (filed January 29, 2015), wherein the Younkins claimed that Appellant was running personal expenses through his business. N.T., 9/11/18, at 16-23, 112. In the matter *sub judice*, the trial court took judicial notice of findings 5, 13, 14, 23, 24, 32, 33, 60, and 84, from that January 29, 2015 opinion. ***Id.*** at 18-23. Those findings provided as follows:

5. There is no evidence that Cenneth Younkin or Dorothy Younkin served as a chief operating officer for the coal companies or that they directed the day to day activities of mining operations, hiring and firing employees, attending to office management and payroll, engaging in coal sales, marketing, contracting for and collections of receivable, banking relationships, establishment of credit lines, or purchasing of major equipment. These responsibilities appear to have resided in [Appellant].

\* \* \*

13. BTC Developments is a Pennsylvania general partnership that was formed around 1983 by [Appellant], Timothy Show, and Cenneth Younkin, each being equal one third owners.

14. The purpose of BTC Developments was to be a land holding company, and Tri-Star Mining was to mine the coal and other minerals off of the land owned by BTC Developments.

\* \* \*

23. In or about August 1994, the parties agreed that Dorothy Younkin, Darlene Beener, and Rita Show would become equal partners of BTC Developments.

- 12 -

24.     The spouses were at no time engaged in the business for purposes of meeting and making decisions but were, for the most part, partners in name only.

* * *

32.     Both Darlene Beener and Rita Show indicated that they relied upon their husbands to make the decisions regarding their interests in BTC Developments.

33.     In that regard, Timothy Show indicated that he similarly trusted [Appellant] to run BTC Developments and deemed himself to be an employee thereof.

* * *

60.     The Mineral Royalty and Surface Rent Waiver Agreement was not executed by the three spouse partners, Dororthy, Darlene, and Rita, as they were never involved in the business affairs.

* * *

84.     In addition, [the Beeners and Shows] paid various legal fees involved in these and other legal actions from BTC [D]evelopment funds, which payments were improper expenses for the partnership.

*Younkin v. Beener, et al*, 353 Civil 1999 (filed January 29, 2015) (unnumbered at 3-13).  Furthermore, Appellant conceded at the nonjury trial that he had also pled guilty to tax evasion in a separate federal case as a result of running personal expenses through his businesses.  N.T., 9/11/18, at 112.

In piercing the corporate veil to find Appellant personally liable, the trial court provided the following explanation:

The parties were involved in previous litigation concerning Appellant's alleged "freezing out" of [Younkin] and her husband, Cenneth Younkin, from the operation and control of the several businesses owned collectively by the Beeners, Younkins, and Shows, including Tri-Star Mining, Inc. and BTC Developments. At the beginning of the nonjury trial, this [c]ourt took judicial notice of the Memorandum and Order issued in that previous case by the Honorable Judge David C. Klementik on January 29, 2015, including specific portions read into the record for clarity. Tr. 9:6-8; 16:19-25:13. We did so for the purpose of avoiding the re-litigation of issues and facts relevant to the current case. A passage in Judge Klementik's Memorandum reads as follows:

> It is clear that [Appellant] controlled the company operations because Timothy Show repeatedly stated that it was immaterial whether he agreed with [Appellant] or not in the way the company was operated, he only wanted to have employment. Within that meager expectation Timothy Show allowed [Appellant] to have free reign with the company operations and decisions.

Tr. 23:1-25:13; Memorandum 27, Jan. 29, 2015. The Memorandum goes on to say that:

> [Cenneth Younkin] was expected to provide continuing personal guarantees for equipment loans, reclamation bonding increments, and other high ticket obligations of the closely held corporation without having had a full opportunity to participate as an officer and director through the receipt of monthly financial statements and sufficient information with which to make decisions. Tri-Star Mining was essentially a one-man show and that "one man" was not willing to cooperate with [Cenneth Younkin].

Memorandum 27, Jan, 29, 2015. These passages, as well as the testimony at trial of both [Younkin] and Appellant, demonstrate that Tri-Star Mining, Inc. failed to adhere to corporate formalities with respect to the allocation of power amongst its shareholders, directors, and officers, and was under the sole control of Appellant. Thus, we find that it is appropriate to pierce the corporate veil and hold Appellant individually liable for the

- 14 -

disposition and sale of the Dragline carried out by his alter ego, Tri-Star Mining, Inc..

Trial Court Opinion, 3/29/19, at 7-8 (footnote omitted).

We agree with the trial court's determination. The evidence of record supports the conclusion that Appellant failed to adhere to corporate formalities with respect to the allocation of power amongst its shareholders, directors, and officers, and that the corporation was under the sole control of Appellant. *Lomas*, 130 A.3d at 126. Moreover, the evidence supports a finding of substantial intermingling of corporate and personal affairs and use of the corporate form to perpetuate a fraud. *Id.* Thus, we conclude that the trial court did not err by finding Appellant personally liable for conversion by piercing the corporate veil. Accordingly, Appellant is entitled to no relief on his third and fourth issues.

In his fifth and sixth issues, Appellant argues that no breach of bailment-agreement action or replevin action was proven. Appellant's Brief at 10-11. The trial court explicitly stated that "Appellant was found liable under the counts for conversion and unjust enrichment." Trial Court Opinion, 3/29/19, at 4. Thus, we agree that breach of bailment agreement and replevin were not established, and we need not further discuss the claim.

In his seventh issue, Appellant argues the causes of action for conversion and unjust enrichment were barred by the statute of limitations. Appellant's Brief at 12. Appellant asserts that the statute of limitations for

conversion is two years.[7] *Id.* Appellant maintains that the Dragline was sold for scrap on August 8, 2008. *Id.* Thus, the time for filing the lawsuit expired on August 9, 2010, but was not filed until May 11, 2012. *Id.* Accordingly, the statute of limitations barred a cause of action for conversion. *Id.* Further, Appellant posits that the trial court erred in applying the discovery rule to the Statute of Limitations in allowing the cause of action to proceed. *Id.* at 13. Appellant maintains that Younkin had a duty to check on the status of the Dragline, "from time to time, at least once a year." *Id.* Appellant contends that Younkin's claim that she was not able to discover the Dragline was missing until November 11, 2011, at which time she obtained internet service is insufficient to establish due diligence. *Id.* Appellant maintains that Younkin failed to meet the discovery rule. *Id.*

We first note that Appellant failed to raise any claim regarding the statute of limitations as to the unjust enrichment cause of action in his Pa.R.A.P. 1925(b) statement. Thus, any claim regarding such is waived.[8] *See*

---

[7] Notably Appellant does not make an argument regarding the applicable statute of limitations for an unjust-enrichment cause of action.

[8] We also note that although Appellant raised a claim of laches in his seventh issue presented in his statement of questions involved, Appellant's Brief at 4, he makes no argument regarding such in his brief. Accordingly, we deem this claim abandoned and waived. *See Green v. Green*, 69 A.3d 282, 286 n.3 (Pa. Super. 2013) (finding issues waived for failure to develop claims in argument section of appellate brief). Moreover, even if it had been addressed in his brief, we would deem this issue waived for failure to include it in his Pa.R.A.P. 1925(b) statement.

***Greater Erie Indus. Development Corp. v. Presque Isle Downs, Inc.***,

88 A.3d 222, 223 (Pa. Super. 2014) (quoting ***Commonwealth v. Lord***, 719

A.2d, 306, 309 (Pa. 1998)) ("Any issues not raised in a Pa.R.A.P. 1925(b)

statement will be deemed waived.").

Moreover, the statute of limitations for a cause of action for conversion

is two years. 42 Pa.C.S. § 5524(3). Thus without application of the discovery

rule, Younkin's conversion action would be barred by the statute of limitations.

Our Supreme Court has explained:

> Generally, a cause of action accrues, and thus the applicable
> limitations period begins to run, when an injury is inflicted. Once
> a cause of action has accrued and the prescribed statutory period
> has run, an injured party is barred from bringing his cause of
> action. The running of the statute of limitations is not tolled by
> mistake, misunderstanding, or lack of knowledge.

***Nicolaou v. Martin***, 195 A.3d 880, 892 (Pa. 2018). "Acting as an exception

to this general rule, however, is the discovery rule, which originated in cases

where the plaintiff's injury or its cause was neither known nor reasonably

ascertainable." ***Id.*** "Accordingly, the discovery rule tolls the statute of

limitations where the plaintiff is reasonably unaware that he has been injured

and that his injury has been caused by another party's conduct." ***Id.*** "We

have explained that **reasonable diligence** is not an absolute standard but,

rather, is "what is expected from a party who has been given reason to inform

himself of the facts upon which his right of recovery is premised." ***Id.***

(emphasis added).

[I]t is well-settled that the reasonable diligence standard is objective, as the question is not what the plaintiff actually knew of the injury or its cause, but what he might have known by exercising the diligence required by law. That being said, the objective reasonable diligence standard is sufficiently flexible ... to take into account the differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question and, as such, is to be applied with reference to individual characteristics.

Under this reasonable diligence standard, a plaintiff's actions are examined to determine whether the plaintiff demonstrated those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interest and the interest of others. It is the party that asserts application of the discovery rule that bears the burden of proving that reasonable diligence was exercised. Finally, as noted, because the reasonable diligence determination is fact intensive, the inquiry is ordinarily a question for the jury. Nevertheless, courts may resolve the matter at the summary judgment stage where reasonable minds could not differ on the subject.

**Nicolaou**, 195 A.3d at 893-894. (internal quotation marks omitted). Our Supreme Court further explained that "the reasonable diligence standard is objective, examining not what the plaintiff actually knew, but what a reasonable person facing the same circumstances confronting the plaintiff at the time in question would have known upon the exercise of reasonable diligence." **Id.** at 894.

The trial court addressed this issue as follows:

The Dragline was sold for scrap on August 8, 2008. Ordinarily, under the applicable statute of limitations, [Younkin's] claim would be barred after August 8, 2010. However, [Younkin] testified that she was unaware of the sale until she and her husband performed a Google satellite search for the Dragline in November 2011. [Younkin] testified that she had not been in any communication whatsoever with Appellant regarding the Dragline,

- 18 -

as the parties were involved in other lawsuits. She also testified that, because she knew the engine had been taken out of the Dragline, she felt certain that it was not going to be moved anywhere. It was only until she performed the Google satellite search in November 2011, noticing that historical images of the area from 2008 depict the Dragline, while 2009 images of the same area show the Dragline missing, that [Younkin] discovered that it had been disposed of. . . . For these reasons, we held that that [Younkin] did not reasonably learn of the conversion of the Dragline until November 2011, and thus the filing of her conversion claim in 2012 was timely.

Trial Court Opinion, 3/29/19, at 9-10 (internal citations omitted).

The evidence of record establishes that prior to her discovery in November of 2011 that the Dragline was missing, Younkin had no reason to believe the Dragline would be moved from BTC Developments' property, where the parties had left it in 1993. N.T., 9/11/18, at 31-35. Younkin testified that she was aware of the placement of the Dragline in 1993, and added that the Dragline operator "walked it across [the property]. Took him forever to get it across because it moved very slowly." *Id.* at 31. When Younkin became Executrix in 2002, the Dragline was still on BTC Developments' property. *Id.* at 36. Younkin testified that she believed that the Dragline was safely placed on that property and could remain there because she and her husband were part owners of that property. *Id.* at 37. She also knew that the engines had been removed from the Dragline and believed it could not be moved. *Id.* at 36. She further testified that it was not able to be "walked off" the property. *Id.* at 40. It was not until she conducted a search on Google Earth and historical satellite pictures in

- 19 -

November 2011 of the BTC Developments' property that Younkin discovered the Dragline was on BTC Developments' property in 2008, but not in 2009. *Id.* at 39.

Thus, utilizing the reasonable-diligence standard, we agree with the trial court's invocation of the discovery-rule exception to the statute of limitations. Reasonable individuals facing the same circumstances confronting Younkin at the time in question would have had no reason to believe that the Dragline would be or could be moved from the property. *Nicolaou*, 195 A.3d at 894.[9] In fact, the Dragline was not moved, but instead was disassembled and scrapped by Kantner per the arrangement with Appellant. Younkin knew that the Dragline had been placed on BTC Developments' property and believed that it safely remained there, as she and her husband were part owners of that property. It was estate property and no one had contacted her regarding movement or scrapping of the Dragline. N.T., 9/11/18, at 41. Furthermore, during the period of 2008-2009, when the Dragline was scrapped, neither Younkin nor her husband had any control or participation in BTC Developments. *Id.* at 46. Additionally, neither Younkin nor her husband received any money from the scrapping of the Dragline. *Id.* It was not until Younkin used the satellite feature on her internet service that she became

---

[9] We note that Appellant incorrectly states that Younkin was required to use "due diligence" in order to have the discovery rule invoked. Appellant's Brief at 13. As outlined above, the proper standard utilized is "reasonable diligence." *Nicolaou*, 195 A.3d at 893-894.

- 20 -

aware that the Dragline was no longer there. Prior to that happenstance, she had no reason to believe that the Dragline would not be where it had been placed since 1993. Furthermore, Appellant's arbitrary assignment of a duty that Younkin check on the Dragline every year is baseless and unfounded. Younkin filed the present lawsuit within two years of her discovery that the Dragline was missing. Thus, we agree that the trial court properly invoked the discovery rule exception to the statute of limitations. Appellant is entitled to no relief on this claim.

In his final issue, Appellant argues that the Dragline had been abandoned. Appellant's Brief at 13. Appellant argues that the Dragline became inoperable in 1993 and remained in the same place until August of 2008. *Id.* Appellant asserts that after Younkin replaced Appellant as Executrix of the Estate in 2002, she did nothing to "take charge" of the Dragline. *Id.* Appellant maintains that "[t]he intent to abandon can be inferred from [Younkin's] actions." *Id.* at 14. Appellant posits that "[Younkin] did nothing at all for almost 10 years. Considering this passage of time and inaction, a reasonable person would have concluded that the Dragline had been abandoned." *Id.* at 14.

> With regard to claims of abandonment, we note:
>
> Abandonment involves an intention to abandon, together with an act or omission to act by which such intention is apparently carried into effect. In determining whether one has abandoned his property or rights, the intention is the first and paramount object of inquiry, for there can be no abandonment without the intention to abandon. The intent to abandon is to be determined from all

- 21 -

of the facts and circumstances of the case. The question of whether a particular act amounts to an abandonment is generally one of intention. When deciding whether an object has been abandoned, we must consider the nature of the property, the acts and conduct of the parties in relation thereto and the other surrounding circumstances.

*J.W.S. Delavau, Inc. v. Eastern America Transport & Warehousing, Inc.*, 810 A.2d 672, 684 (Pa. Super. 2002) (internal citations omitted). In evaluating whether the user abandoned the property, the court must consider whether there was an intent to abandon the property interest, together with external acts by which such intention is carried into effect. *Lawson v. Simonsen*, 417 A.2d 155, 160 (Pa. 1980). Mere nonuse does not amount to abandonment. *Id.*; *see also Buffalo Tp. v. Jones*, 813 A.2d 659, 665 (Pa. 2002).

In addressing this issue, the trial court stated:

Appellant specifically admitted that, since [Younkin] was appointed to administer the Estate in 2002, he had not had any conversation at all with her regarding the Dragline. Thus, Appellant did not provide sufficient evidence to show any intention on the part of [Younkin] to abandon the Estate's property rights in the Dragline, nor did Appellant show any "external acts" by which any intention to abandon was carried into effect. Accordingly, we found that [Younkin] had not abandoned the Dragline before it was sold in 2008.

Trial Court Opinion, 3/29/19, at 8-9 (internal citations omitted).

We agree. Appellant erroneously asserts that because of the passage of time and Younkin's inaction regarding the Dragline, a reasonable person could conclude that the Dragline had been abandoned. As outlined above, our Supreme Court has made clear that nonuse alone does not establish a claim

of abandonment. ***Lawson***, 417 A.2d at 160. Moreover, Appellant does not produce any evidence that Younkin had the intent to abandon the Dragline, or that she engaged in any external acts by which such intention was carried into effect. At no time did Younkin directly communicate any intention to abandon the Dragline. In fact, Appellant conceded that he did not contact anyone from the Estate prior to having the Dragline scrapped regarding his belief that it had been abandoned. N.T., 9/11/18, at 115. Moreover, the Dragline was on property partially owned by Younkin. Younkin's behavior did not indicate intent to abandon. Thus, we conclude there is no merit to Appellant's claim that the Dragline had been abandoned. Appellant is entitled to no relief on this claim.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/27/2020